C C DISTRIBUTORS, INC., Plaintiff,

v.

UNITED STATES, Defendant,

and

DEL-JEN, Inc., Intervenor.

No. 97–517C.

United States Court of Federal Claims.

Sept. 2, 1997.

George W. Miller, Hogan & Hartson L.L.P., Washington, DC, attorney of record for plaintiff.

Katherine M. Kelly, Commercial Litigation Branch, Civil Division, Department of Justice, with whom were Joseph A. Kijewski, Assistant Director, David M. Cohen, Director, and Frank W. Hunger, Assistant Attorney General, attorneys of record for defendant. Clarence D. Long, III, Department of the Air Force, of counsel.

William A. Roberts, III, Howrey & Simon, Washington, DC, attorney of record for intervenor.

## OPINION

HORN, Judge.

### FACTS

Plaintiff, C C Distributors, Inc. (CCD), is a Texas corporation that operates a Contractor Operated Civil Engineering Supply Store (COCESS) at Tyndall Air Force Base, Florida, pursuant to a contract with the Department of the Air Force. A COCESS is described as a hardware, construction materials and building supply store, located on an Air Force base to support civil engineering personnel performing maintenance and repair services on buildings and infrastructure at the base. CCD has operated the COCESS at Tyndall Air Force Base continuously since 1994, and is currently under contract to operate a store at Tyndall until the end of September, 1997. CCD's current COCESS contract at Tyndall includes a "base year" and two six-month option periods. The first option has been exercised, the second option will not be exercised, but the Air Force extended the contract three additional months.[1] On October 1, 1997, the intervenor, DEL–JEN, Inc. (DEL–JEN), which was awarded the civil engineering portion of the new contract at Tyndall, will take over the civil engineering functions, including the COCESS duties formerly performed by CCD. DEL–JEN will commence its responsibilities at Tyndall Air Force Base under a partitioned, comprehensive contract awarded for functional areas of base operating support services covering civil engineering, transpor-

---

1. Although paragraph 47 of plaintiff's complaint states that the contract was modified to extend the contract to conclude on September 28, 1997, paragraph 50 of plaintiff's complaint states that a letter dated May 29, 1997 extended the same contract until October 1, 1997.

tation, supply/fuels, and information management functions.

According to plaintiff's complaint, on August 3, 1995, the Air Force "published a notice in the Commerce Business Daily (CBD) to solicit potential contractors to provide 'Base Operating Support Services' to be performed at Tyndall AFB, located in the northern panhandle of Florida." The contract was designed as "covering four 'functional area groupings,' including 'civil engineering,' 'transportation,' 'supply/fuels,' and 'information management.'" This initial notice indicated that the Air Force intended to issue a request for proposals (RFP) in connection with a cost study being conducted pursuant to OMB Circular A–76 to determine whether the services should be contracted out to the private sector or performed in-house by government personnel. The August 3, 1995 notice also stated that the Air Force contemplated awarding a small business set-aside contract.

On September 28, 1995, the Air Force published an amended notice in the CBD, expanding the solicitation field to include all potential offerors, large as well as small businesses, and adding a requirement for aircraft maintenance services in support of F–15 aircraft. The Air Force also announced that this contract could be partitioned, by functional area groupings, thereby allowing for different contractors for the various functional areas, and that the solicitation was scheduled to be released in November 1995.

Plaintiff admits that it was aware of the CBD announcements, but contends that both of the CBD announcements, designed to implement a comprehensive repackaging of base services, failed to indicate that the CO-CESS responsibilities would be subsumed within the proposed "civil engineering" functional area. Both the August 3, 1995 and the September 28, 1995 CBD notices included the following language concerning the "civil engineering" functional area:

1) Civil Engineering (CE), which includes requirements to maintain all assigned facilities, associated systems and supporting infrastructure at Tyndall AFB and other off-base sites to include [listing of facilities omitted].

The original RFP, as issued, also referred to "civil engineering activities" and provided, in pertinent part, as follows:

5.5 LOGISTICAL SUPPORT. The contractor shall maintain and operate material acquisition function LAW AFP 85–81, and AFM 67–1 series to provide support for all Civil Engineering activities.

The RFP was amended numerous times prior to its ultimate October 9, 1996 closing date.[2] In amendment number 5, issued on August 19, 1996, explicit reference to the COCESS facility appeared, as follows:

5.5 LOGISTICAL SUPPORT. The contractor shall maintain and operate material acquisition function LAW AFP 85–81, and AFM 67–1 series to provide support for all Civil Engineering activities; accomplishing tasks currently performed by the Contractor Operated Civil Engineering Supply Store (COCESS).

CCD never sought clarification of the CBD notices, did not request to be put on a bidders' list, did not request a copy of the RFP, or request clarification of the RFP. The Air Force did not attempt to solicit or notify CCD about the RFP outside of the August 3, 1995 and September 28, 1995 announcements published in the CBD. CCD did not submit an offer. DEL–JEN was awarded the civil engineering portion of the contract on April 1, 1997, for performance to commence on October 1, 1997, and two other contractors were selected, one to provide aircraft maintenance services, and one to provide supply/fuel and on-base transportation services.

In early April, 1997, CCD alleges it first learned about the award to DEL–JEN. Consequently, CCD contacted DEL–JEN to indicate that CCD looked forward to working with DEL–JEN at Tyndall. According to plaintiff, it was during this conversation that CCD allegedly learned of the possibility that the COCESS function had been merged or subsumed into the contract awarded to DEL–JEN for comprehensive civil engineer-

---

**2.** The October 9, 1997 closing date is taken from the final GAO opinion issued on July 17, 1997.

*CC Distributors, Inc.,* Comp. Gen. Dec. B–277206, at 2 (July 17, 1997).

ing functions at Tyndall. At that time, CCD and DEL–JEN had a dialogue about CCD possibly subcontracting from DEL–JEN the COCESS portion of the newly awarded contract. Thereafter, on April 25, 1997, and on April 30, 1997, CCD wrote to the contracting officer at Tyndall and to the Air Force's Director of Contracting, Air Education and Training Command. According to plaintiff's complaint, the letters "asked why CCD was not invited to submit an offer for the contract and inquired about the effect, if any, of the contract award to DEL–JEN on the continuation of CCD's COCESS contract." On May 28, 1997, CCD signed a modification of its current contract, which was signed by the Air Force on June 5, 1997, and which created a new end date for plaintiff's contract. Subsequently, in a letter dated May 29, 1997, the Air Force responded to CCD's letters of late April, 1997, and verified that DEL–JEN would assume CCD's COCESS responsibilities on October 1, 1997, at the conclusion of CCD's contract.

CCD filed a bid protest with the General Accounting Office (GAO) on June 6, 1997, "alleging that the Air Force effectively and improperly excluded CCD from the competition for the opportunity to perform the COCESS function and the other services to be performed by DEL–JEN." On July 17, 1997, CCD's protest was dismissed by the GAO on the grounds that:

> CCD's protest alleges improprieties in the solicitation and thus should have been filed prior to the closing date. CCD concedes that it was aware of the agency's procurement of the civil engineering services through both the August 3, 1995, CBD announcement seeking qualified small business sources and the September 28, 1995, announcement of the issuance of the RFP on an unrestricted basis. In the year between the announcement of the procurement and the closing date, CCD never requested a copy of the RFP and never sought clarification of the requirement. While we question CCD's assertion that the CBD announcements did not indicate that the COCESS function was included in the procurement, in any case, CCD had ample opportunity to seek clarification from the agency but failed to do so. In

this regard, it is also clear from CCD's protest submission that it was concerned that the civil engineering function award may have included the COCESS function because CCD sought assurance from the contracting officer that exercise of its remaining option on its COCESS contract would not be affected by the award of the civil engineering function to DEL–JEN. Where, as here, the protestor has failed to diligently pursue the information that forms the basis for its protest, we view the protest as untimely filed.

*CC Distributors, Inc.*, Comp. Gen. Dec. B–277206, at 2–3 (July 17, 1997) (citations omitted).

## DISCUSSION

The defendant filed a motion to dismiss the complaint under RCFC 12(b)(1), and the intervenor filed a motion for partial dismissal, both on August 14, 1997. Plaintiff responded with an opposition brief on August 20, 1997. The defendant and the intervenor both filed reply briefs in response to plaintiff's opposition submission on August 22, 1997. Finally, plaintiff filed a supplemental memorandum with leave of the court on August 26, 1997.

■ When considering a motion to dismiss, the court may consider all relevant evidence in order to resolve any disputes as to the truth of the jurisdictional facts alleged in the complaint. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir.1988). The court is required to decide any disputed facts which are relevant to the issue of jurisdiction. *Id.* at 747.

■ The standard for weighing the evidence presented by the parties when evaluating a motion to dismiss for lack of jurisdiction, pursuant to RCFC 12(b)(1), has been articulated by the United States Supreme Court and the United States Court of Appeals for the Federal Circuit, as follows: "in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *ac-*

cord *Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed.Cir.1989); *see also Alaska v. United States*, 32 Fed.Cl. 689, 695 (1995), *appeal dismissed*, 86 F.3d 1178 (Fed.Cir.1996). In rendering a decision, the court must presume that the undisputed factual allegations included in the complaint by plaintiff are true. *Miree v. DeKalb County*, 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 2492 n. 2, 53 L.Ed.2d 557 (1977); *Alaska v. United States*, 32 Fed. Cl. at 695; *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d at 746.

■■■ The burden of establishing jurisdiction is on the plaintiff. *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936); *Alaska v. United States*, 32 Fed. Cl. at 695; *Catellus Dev. Corp. v. United States*, 31 Fed. Cl. 399, 404 (1994). The court should not grant a motion to dismiss, however, "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). Nonetheless, "conclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss." *Briscoe v. LaHue*, 663 F.2d 713, 723 (7th Cir.1981), *aff'd*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983).

The Administrative Dispute Resolution Act of 1996, Pub.L. No. 104–320, § 12(a)-(b), 110 Stat. 3870, 3874 (1996), amended the Tucker Act, 28 U.S.C. § 1491 (1994), and provided the United States Court of Federal Claims with federal procurement, post-award bid protest jurisdiction, concurrent with that of federal district courts, for actions filed on or after December 31, 1996. See 28 U.S.C.A. 1491(b)(1)-(4) (West Supp.1997); *Day & Zimmerman Servs. v. United States*,[3] 38 Fed.Cl. 591, 597–98 (1997); *ATA Defense Indus., Inc. v. United States*, 38 Fed.Cl. 489, 493–94 (1997); *GraphicData, LLC v. United States*, 37 Fed.Cl. 771, 778 (1997); *Cincom Sys., Inc. v. United States*, 37 Fed.Cl. 663, 669 (1997); *Cubic Applications, Inc. v. United States*, 37 Fed.Cl. 345, 349 (1997); *Cubic Applications, Inc. v. United States*, 37 Fed. Cl. 339, 341 (1997).

The revised section of the statute, which confers post-award bid protest jurisdiction on the United States Court of Federal Claims states:

(b)(1) Both the Unites [sic] States Court of Federal Claims and the district courts of the United States shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. Both the United States Court of Federal Claims and the district courts of the United States shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded. 28 U.S.C.A. § 1491(b)(1) (West Supp.1997).

The defendant and the intervenor argue that the plaintiff lacks standing to protest in the case at bar, because the plaintiff is not an "interested party" under the revised statute. The defendant and intervenor rely heavily on the fact that the plaintiff failed to submit a proposal in response to the Air Force's RFP. Neither the original version of 28 U.S.C. § 1491, or the modified version, define the term "interested party." The phrase, however, has been the subject of prior legislative and judicial attention in the context of government contract protests lodged in various fora.

For bid protesters before the General Accounting Office (GAO), the relevant statute defines "interested party" as "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of a contract or by a failure to award the contract." 31 U.S.C.A. § 3551(2) (West Supp.1997). Congress recently had occasion to review, and reaffirm, the GAO definition of "interested party," when it amended 31 U.S.C.A. § 3551(2). Although Congress made minor modifications to the statute, it

**3.** In the Westlaw electronic database, the case, using the same citation, is styled as *United States v. J & J Maintenance, Inc.*, Intervenor.

left unchanged the definition of "interested party" in the GAO statute. Pub.L. No. 104–106, Div. D, Title XLIII, § 4321(d)(1), Feb. 10, 1996, 110 Stat. 674 (1996). This reexamination occurred in February 1996, merely six months prior to the expansion of the jurisdiction of the United States Court of Federal Claims, on October 19, 1996, to include post-award bid protests brought by an "interested party." Pub.L. No. 104–320, § 12(a), Oct. 19, 1996, 110 Stat. 3874 (1996).

Similarly, when the General Services Administration Board of Contract Appeals (GSBCA) was authorized to hear bid protests on procurements for automated data processing equipment, only an "interested party" had standing to bring those cases before the Board. The GSBCA statute adopted the same definition of "interested party" as was in use before the GAO. 40 U.S.C. § 759(f)(9)(B) (1994).[4] Furthermore, when interpreting the definition of "interested party" under the now repealed GSBCA bid protest jurisdiction, the United States Court of Appeals for the Federal Circuit adopted the GAO definition of "interested party" and wrote:

> The statute imposes two requirements on any party who would protest an agency's procurement before the board. The first is that the party must be an "actual or prospective bidder." *See MCI Telecommunications Corp. v. United States,* 878 F.2d 362 (Fed.Cir.1989). The second is that such a bidder must have a "direct economic interest [that] would be affected by the award of a contract or failure to award the contract." *See United States v. IBM,* 892 F.2d 1006, 1010 (Fed.Cir.1989).

*Federal Data Corp. v. United States,* 911 F.2d 699, 703 (Fed.Cir.1990).

Claims for relief in Federal district courts are brought under the Administrative Procedure Act, which provides at 5 U.S.C. § 702 that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702

(1994). This requirement in the district courts has been interpreted as mandating that a complainant establish that it has suffered or will suffer injury in fact from agency action, and that its interests lie within the zone of interests protected or regulated by a statute. *Clarke v. Securities Indus. Ass'n,* 479 U.S. 388, 395–96, 107 S.Ct. 750, 754–55, 93 L.Ed.2d 757 (1987).

The district court approach to standing in bid protest cases was carefully articulated in *National Federation of Federal Employees v. Cheney,* 883 F.2d 1038 (D.C.Cir.1989), *cert. denied,* 496 U.S. 936, 110 S.Ct. 3214, 110 L.Ed.2d 662 (1990), as follows:

> Since *Scanwell Laboratories, Inc. v. Shaffer,* 424 F.2d 859 (D.C.Cir.1970), this Circuit has recognized that a disappointed bidder in a government contract award had standing under section 702 of the APA, 5 U.S.C. § 702, to act as a " 'private attorney general,' " in order to "prevent[ ] the granting of [a] contract[ ] through arbitrary or capricious action" amounting to "illegal [agency] activity." 424 F.2d at 864. *See also National Maritime Union of America [v. Commander],* 824 F.2d [1228] at 1236–38 [(D.C.Cir.1987)]; *Orange Park Florida T.V., Inc. v. FCC,* 811 F.2d 664, 671–72 (D.C.Cir.1987); *Delta Data Systems Corp. v. Webster,* 744 F.2d 197 (D.C.Cir.1984). The disappointed bidder doctrine has since been recognized by most circuits and Congress affirmatively recognized the doctrine in the legislative history of the Federal Courts Improvement Act of 1982.
>
> We note that courts have applied disappointed bidder status to meet both Article III injury requirements and zone of interest requirements. This Circuit has considered "disappointed bidder" status as establishing the bidder's right to step into the shoes of the public and assert the public interest. . . . More recently, now-Justice Scalia, while a member of our Court, restated this emphasis on the public interest: the "main objective" of the disappointed bidder doctrine is "to assure that the gov-

---

4. In 1996, 40 U.S.C. § 759, including the GSBCA's bid protest jurisdiction regarding automated data processing equipment, was repealed.

Pub.L. No. 104–106, Div. E, Title LI, § 5101, Feb. 10, 1996, 110 Stat. 680 (1996).

ernment obtains the most advantageous contract[ ] by complying with the procedures which Congress and applicable regulations have provided." *Delta Data Systems*, 744 F.2d at 206. *See also Orange Park Florida T.V.*, 811 F.2d at 672 ("[A] wrongful award of a government contract constitutes a discrete economic injury to unsuccessful bidders, who [then] have an incentive to vindicate the public interest as well as their own by insisting on the integrity of the procurement process.") (citations omitted).

While Judge Tamm's original language in *Scanwell Laboratories* is broadly phrased, apparently to include as a disappointed bidder anyone "who suffers injury as a result of the illegal activity," 424 F.2d at 864, a decade later he made it clear that disappointed bidder status is unavailable to those who "cannot claim the special relationship found ... to exist between a bidder and the government; unlike the bidder in the context of a solicitation, they have not 'placed in the hands of the representatives of the Government the power to bind [it] to a contract.'" *Control Data Corp. v. Baldrige*, 655 F.2d [283] at 293 [(D.C.Cir. 1981)] (quoting *Merriam v. Kunzig*, 476 F.2d [1233] at 1242 n. 7 [(3d Cir.1973)]. The government is obligated to provide the bidder under this special relationship with a "legally valid" and "fair procurement," *National Maritime*, 824 F.2d at 1237–38, which presumably fosters competition amongst contractors thereby benefiting the public interest. *See Gull Airborne Instruments, Inc. v. Weinberger*, 694 F.2d 838, 842 (D.C.Cir.1982). Not every bidder in a solicitation may assert disappointed bidder standing, otherwise nuisance suits could handicap the procurement system. Rather, standing is conferred only to those bidders who are " 'within the zone of active consideration' for the bid's award." *National Maritime*, 824 F.2d at 1237–38 n. 12 (quoting *CACI, Inc.–Federal v. United States*, 719 F.2d [1567] at 1574–75 [(Fed. Cir.1983)], other citation omitted). *See also Morgan Business Assocs., Inc. v. United States*, 223 Ct.Cl. 325, 619 F.2d 892, 896 (1980).

*National Fed'n of Fed. Employees v. Cheney*, 883 F.2d at 1052–53 (footnotes omitted).

Although the APA is specifically referenced in the legislation which expanded jurisdiction of the United States Court of Federal Claims to review post-award bid protests, the reference is to 5 U.S.C. § 706 (the section on standard of review), not to 5 U.S.C. § 702, the APA section on standing. 28 U.S.C.A. § 1491(b)(4) (West Supp.1994). The Administrative Disputes Resolution Act of 1996, which granted post-award bid protest jurisdiction to this court, provides that, "[i]n any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5." 28 U.S.C.A. § 1491(b)(4) (West Supp.1997). By reference to section 706 of the APA, the court is directed to hold unlawful, and to set aside, agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1994).

In the absence of a definition of "interested party" in 28 U.S.C.A. § 1491(b)(1), plaintiff urges this court to adopt a broad, plain meaning definition of the term, and cites to Webster's Third International Dictionary 1178 (1986), as follows: "having a share or concern in some affair or project; liable to be affected or prejudiced." Plaintiff argues, therefore, that it has standing to bring the above-captioned protest under the ordinary or natural meaning of the phrase, inasmuch as its business opportunities at Tyndall Air Force Base are being curtailed by the contract award to the intervenor. Plaintiff also argues that a plain, and broader, meaning of the phrase "interested party" is consistent with the settled law of standing to protest contract awards, as it is applied by federal district courts. The defendant and the intervenor, however, argue that inclusion by the Congress of the term "interested party" in the amendments to 28 U.S.C.A. § 1491 should direct the court to adopt the definition in use at the GAO and spelled out in 31 U.S.C.A. § 3551(2).

■ The question to be addressed, therefore, is by which standard to identify an "interested party" in post-award bid protests cases brought in the Court of Federal Claims

pursuant to the amendments to 28 U.S.C.A. § 1491. This court has exercised pre-award bid protest authority, prior to the more recent expansion of the court's jurisdiction effective on December 31, 1996, to include statutory pre- and post-award cases. Prior to the recent legislative revision of 28 U.S.C. § 1491(b)(1), the theory underlying the court's pre-award bid protest jurisdiction was one of implied contract between the government and contractors, when the government issued a solicitation, to honestly and fairly consider bids and proposals from contractors who invest the time and expense of preparing and submitting a bid or proposal in response to an invitation for bids or request for proposals. *Keco Indus., Inc. v. United States,* 203 Ct.Cl. 566, 571, 492 F.2d 1200, 1202 (1974). Under this theory, a nonbidder had no standing to submit a pre-award protest. Otherwise stated: "if the plaintiff has not submitted a bid ... no implied duty to fairly consider plaintiff's bid arises (*i.e.,* is imposed upon the government), and this court lacks jurisdiction over the plaintiff's suit for injunctive relief." *Control Data Sys., Inc. v. United States,* 32 Fed.Cl. 520, 524 (1994). *See also Motorola Inc. v. United States,* 988 F.2d 113, 114–15 (Fed.Cir.1993). Even a contractor that submitted a bid must have been able to demonstrate actual or threatened injury in order to have standing for a preaward protest. *Caddell Constr. Co., Inc. v. United States,* 9 Cl.Ct. 610, 613 (1986) (offeror did not have a substantial chance for award based upon proposal evaluation, and, thus, did not have standing to protest under 28 U.S.C. § 1491). *See also CC Distributors, Inc.,* Comp. Gen. Dec. B–225603, 87–1 CPD ¶ 312.

The decision by the Congress when it drafted 28 U.S.C.A. § 1491(b)(1) to reference 5 U.S.C. § 706 of the APA, but not the APA standing requirement in 5 U.S.C. § 702, while at the same time to explicitly include the term "interested party" (the standing requirement term used in the GAO protest legislation), appears to the court to be significant on the question of how to determine the definition of "interested party" for post-award bid protest cases filed in this court. In GAO parlance, the term "interested party" can be considered a term of art. Plaintiff, however, proposes that the term "interested party" have one meaning when a contractor protests to the GAO, and another when it protests before this court.[5] Such a definitional scheme is not *per se* impossible. If Congress had expressed an intention to have the same words defined differently in different fora, that would be within the prerogative of the Congress, and the courts would carry out that Congressional intent. However, in the absence of evidence of a Congressional intent to deviate from the settled use and interpretation of a term of art, the effect of which would be to potentially expand significantly the population of protesters, this court is reluctant to embrace the proposed regime of dual definitions. In the absence of a contrary indication, the court finds it appropriate to conclude that Congress intended the amendments in 28 U.S.C.A. § 1491(b)(1) to follow the established, or term of art, meaning of "interested party," as defined by the Congress in the GAO statute, and as reaffirmed by the Con-

**5.** The Fifth Circuit and the Ninth Circuit referred to the GAO definition of "interested party" in two bid protest cases. *Rapides Regional Medical Center v. Secretary, Dep't Veterans' Affairs,* 974 F.2d 565, 570 (5th Cir.1992), *cert. denied,* 508 U.S. 939, 113 S.Ct. 2413, 124 L.Ed.2d 636 (1993); *Waste Management of North America, Inc. v. Weinberger,* 862 F.2d 1393, 1396 (9th Cir.1988). In *Rapides Regional Medical Center,* the Fifth Circuit incorporated the 31 U.S.C. § 3551(2) definition into a hybrid standing test which incorporated the APA and the GAO concepts, when a protest is premised upon concerns about the full and open competition requirements in the Competition in Contracting Act (CICA), 41 U.S.C.A. § 253(a)(1) (1987 & West Supp.1997). *Rapides Regional Medical Center,*

974 F.2d at 569–72. CICA is mirrored for military procurements in 10 U.S.C.A. § 2304(a)(1) (West Supp.1997). While this amalgamation of standing requirements appears to be unique to the Fifth Circuit, it is significant that the court did use the GAO definition of "interested party." In comparison, the Ninth Circuit addressed a litigant's standing solely by invoking the GAO definition of "interested party." *Waste Management of North America, Inc. v. Weinberger,* 862 F.2d at 1396–98. The court emphasized that "[i]nterested parties are 'actual or prospective bidders,'" and found that the litigant lacked standing as it "neither filed a proper bid protest nor submitted a bid." *Id.* Significantly, the Ninth Circuit did not turn to the APA to delineate standing in their decision.

gress just six months prior to the enactment of the amendments to 28 U.S.C. § 1491. *See McDermott Int'l. Inc. v. Wilander*, 498 U.S. 337, 342, 111 S.Ct. 807, 810–11, 112 L.Ed.2d 866 (1991); *Alabama Power Co. v. United States Environmental Protection Agency*, 40 F.3d 450, 454 (D.C.Cir.1994).

■ After considering both the GAO and the federal district and circuit court approaches to the problems posed for the court's consideration, it appears also that most jurisdictions have approached at least one of the key issues involved in resolving matters of standing to bring a bid protest case in a similar fashion and on a case by case basis. Absent disappointed actual bidder status, the cases in the GAO and the federal courts seem to revolve on whether the government in some way precluded a prospective contractor from being able to respond to an RFP. Generally, the risk of not receiving a solicitation or solicitation amendment rests with the potential offeror, unless it is evident that the contracting agency made a deliberate effort to exclude the contractor, or that the agency failed to provide the information after the potential offeror made reasonable efforts to obtain the solicitation or solicitation amendments. *Sentinel Security & Patrol Servs.*, Comp. Gen. Dec. B–261018, 95–2 CPD ¶ 67, at 3; *Eagle Creek Archaeological Servs., Inc.*, Comp. Gen. Dec. B–258480, 95–1 CPD ¶ 43, at 3. For example, the GAO found that a contractor had standing to protest, even though the contractor did not submit a proposal, when, according to the

plaintiff, the solicitation requirements did not allow the contractor to prepare and submit a price proposal. *Tumpane Servs. Corp.*, Comp. Gen. Dec. B–220465, 86–1 CPD ¶ 95, at 2. Standing to protest was found by the GAO when the "agency has made a conscious and deliberate effort to exclude a bidder from competing for the contract." *Reliable Serv. Technology*, Comp. Gen. Dec. B–217152, 85–1 CPD ¶ 234, at 2; *International Ass'n of Fire Fighters*, Comp. Gen. Dec. B–220757, 86–1 CPD ¶ 31, at 3. In another GAO case, a contractor who filed a protest before the GAO, challenging the proposed award of a sole source contract as violative of various statutes promoting the use of domestic products, was declared not to be an interested party with standing to protest, since the contractor was a potential subcontractor and not a prime contractor. *PPG Indus., Inc.*, Comp. Gen. Dec. B–272126, 96–1 CPD ¶ 285, at 2–3. *Accord Julie Research Lab., Inc.*, Comp. Gen. Dec. B–219370, 85–2 CPD ¶ 185, at 2, *recons.*, Comp. Gen. Dec. B–219370.2, 85–2 CPD ¶ 294, at 2; *PolyCon Corp.*, Comp. Gen. Dec. B–218304.2, 85–1 CPD ¶ 714, at 2.

Similarly, in the Federal District Court for the District of Columbia, in *Abel Converting, Inc. v. United States*, standing to protest was found when the contractor had repeatedly requested to be placed on the bidders' mailing list, and the General Services Administration (GSA) had an affirmative duty by virtue of its own regulations to add the incumbent to the mailing list. 679 F.Supp. 1133, 1140 (D.D.C.1988).[6] In *Aero Corp. v.*

---

**6.** Plaintiff relies heavily on *Abel Converting, Inc. v. United States*, 679 F.Supp. 1133 (D.D.C.1988), a pre-award bid protest case, in which an incumbent contractor was not provided a copy of the solicitation, and did not bid, but still was found by the district court to have standing to protest the award of the contract because GSA's efforts were insufficient to satisfy the competition requirements of CICA, and GSA's failure to send a solicitation was arguably within the zone of interests intended to be protected by CICA.

In *Abel*, the district court held that there was injury in fact to the plaintiff, who was the incumbent contractor and who had made affirmative written requests to be added to GSA's mailing list on at least two occasions, but was denied the opportunity to bid on the GSA procurement. The *Abel* court cited to a number of cases for support, but noted that in all of those cases the protestor had made affirmative attempts to ob-

tain the solicitation or to be added to the bidders' list. 679 F.Supp. at 1140. The *Abel* court wrote, "[c]learly, GSA's failure to follow its regulations [regarding inclusion of current contractors on its bidding list] caused this injury, and an order by this Court directing resolicitation would redress that injury. Abel has constitutional standing to seek relief from GSA's failure to mail it a solicitation." *Id.* at 1137.

Critical to distinguishing *Abel* from the instant case, however, are the GSA procurement regulations, which specifically require the agency to place incumbent contractors on the bidders' mailing list, and to receive copies of solicitations for the same or similar items previously provided to the agency. *Id.* at 1138–39. Thus, GSA was held to have failed to follow its own regulations, and that failure precluded Abel from bidding. *Id. See also Energy Transp. Group, Inc. v. Skinner*, 752 F.Supp. 1, 6–7 (D.D.C.1990), *aff'd, 956 F.2d*

*Department of the Navy,* 540 F.Supp. 180, 202–03 (D.D.C.1982), the contractor was determined to have standing to protest the agency decision to sole source the overhauling of Navy aircraft, thereby precluding the contractor from submitting a proposal. In *ATA Defense Industries, Inc. v. United States,* a recent post-award bid protest case in the United States Court of Federal Claims, the contractor, although it had not submitted a proposal, was found to have standing to protest, when it had evinced repeated interest in the procurement, but was precluded from submitting a proposal by the agency's determination to sole source the award. 38 Fed.Cl. 489, 491–92, 494–95 (1997).

In the case at bar, CCD contends that it meets the test to be considered a prospective bidder with standing to protest, since the Air Force did not provide it with notice of the RFP, even though plaintiff was the incumbent contractor, thereby effectively excluding plaintiff from the competition. Plaintiff argues that the CBD announcements were inadequate to provide notice to plaintiff that the COCESS functions were to be part of the procurement in question, and that notification to CCD of the RFP was required, since plaintiff was the incumbent COCESS contractor.

■ Plaintiff also relies on the Federal Acquisition Regulation (FAR) for the proposition that incumbents must be solicited for future procurements, citing FAR 14.205 and 15.403 (negotiated procurement, governed by FAR 15, incorporates the rules from FAR 14, which govern bidders' mailing lists on sealed bidding). 48 C.F.R. §§ 14.205, 15.403 (1996). FAR 14.205–4(a) and (b) provide that when the bidders' mailing list is large, the list may be rotated and different portions of the list may be used for different procurements; but that when the bidders' list management technique of rotation is used, the "previously successful bidder" shall be solicited for the follow-on procurement.

In the case at bar, however, no bidders' list rotation occurred. Specifically, the Air Force built a bidders' list derived from the second of two CBD announcements, and provided a solicitation to all contractors that had expressed interest. Moreover, in the above-captioned case, the COCESS function was a small part of the much larger RFP issued by the Air Force. The fact that the Air Force did not treat CCD as an incumbent and did not solicit plaintiff as an incumbent bidder was reasonable, and not arbitrary or capricious, or in violation of law or regulation. Given the major differences, including broad new requirements in a number of new functional area groupings, between the new procurement and the contract under which plaintiff was performing the COCESS function, the FAR provisions did not give rise to a duty on the part of the Air Force to provide CCD with a copy of the RFP. In the instant case, the Air Force made a decision to change significantly how it would obtain base operating support services for the Tyndall facility. In *Fabricacion Especial De Maquinaria, S.A.,* FAR provision 14.205–4 also did not give rise to a duty on the part of the Air Force to place the plaintiff on the RFP mailing list as an incumbent. B–245792, 92–1 CPD ¶ 40, at 3–4. As stated in that case, "the record shows that the solicitation is a first-time acquisition for DLA [Defense Logistics Agency] based on new requirements. The new procurement involves the purchase and supply of fuel and the delivery of that fuel to three bases, including one location to which the protestor had been delivering government-owned fuel." *Id.*

■ Plaintiff further contends that the CBD announcements gave inadequate notice to the plaintiff that COCESS was a portion of the contemplated procurement. However, as noted above, no duty arose on the part of the Air Force to provide either notice or a copy of the solicitation to CCD. The CBD announcements sought prospective contractor sources in the area of civil engineering support, which as stated in the CBD an-

1206 (D.C.Cir.1992) (distinguishing *Abel* because of incumbent bidder requirements in GSA regulations); *cf. National Law Center on Homelessness and Poverty v. United States Department of Veterans Affairs,* 799 F.Supp. 148, 152–53

(D.D.C.1992) (a somewhat more recent case which found that mere failure to conform to agency regulations might not automatically be deemed patently unreasonable).

nouncements, "includes requirements to maintain all assigned facilities, associated systems and supporting infrastructure at Tyndall AFB." Plaintiff has advised the court that it screens CBD announcements through the use of code categories, such as, "Wholesale Trade—Durable Goods," and, thus, did not take note of the code category for "Facilities Support Management Services," which was used in the relevant CBD announcements. Plaintiff's screening procedures, however, were in use by their own choice; and plaintiff admits that the code used to identify the procurement in the solicitation was the correct one, and in accordance with FAR 19.102(c). 48 C.F.R. § 19.102(d) (1996).

Moreover, the RFP, when it was first issued, stated that the "contractor shall maintain and operate material acquisition function IAW AFP 85–81, and AFM 67–1 series to provide support for *all Civil Engineering activities.*" (emphasis added). Both the language of the CBD announcements and of the original RFP should have alerted the plaintiff, especially as the incumbent COCESS contractor, that its civil engineering support functions at Tyndall likely would be affected by the upcoming procurement.[7]

■ Plaintiff also argues that even if the GAO definition of "interested party" is adopted by the court ("an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract"), plaintiff has standing to protest as a "prospective offeror," relying on *ATA Defense Indus., Inc. v. United States,* 38 Fed. Cl. 489 (1997). In *ATA,* the contractor responded to an Army CBD announcement with a request to be placed on the bidders' mailing list and made the Army aware of its intention to compete. Thereafter, when the Army decided to sole source the procurement to another contractor, ATA wrote a letter requesting an opportunity to bid. 38 Fed.Cl. at 492. The *ATA* court explicitly stated that:

[i]t is not necessary, however, for this court to resolve whether Congress intended the term "interested party" to be defined as set forth in other statutes because, although certainly not an "actual" bidder, plaintiff was a "prospective bidder" ... whose direct economic interest would be affected by the award of the contract. Hence, plaintiff would qualify as an "interested party" even under the definition set forth in Section 3551(2).

38 Fed.Cl. at 494. Furthermore, the *ATA* court wrote:

[a]s explained above, applying Section 3551(2)'s definition of "interested party" to Section 1491(b) would limit potential plaintiffs thereunder to actual and prospective bidders, but there is no indication in the wording of Section 3551(2) that Congress intended to go further and exclude from the scope of "prospective bidders" those parties that intended to present a bid but were prevented from so doing in violation of controlling statutes and regulations.

38 Fed.Cl. at 495. In contrast, the procurement at issue in the case at bar was not sole source, the plaintiff was not excluded from submitting a proposal, CCD did not express to the Air Force an intention to submit a proposal, the bidders' list was not rotated, and CCD was not an incumbent contractor entitled to notice or receipt of the RFP.

■ In its brief filed with this court, CCD also contends that it has standing as the alleged incumbent to protest the Air Force's "bundling" of the COCESS function with other civil engineering services into one functional area grouping. The plaintiff's argument is premised in part upon *Abel Converting, Inc. v. United States. Abel,* which was discussed above, and which is readily distinguishable from the facts of the instant action. For CCD to have standing to protest the defendant's "bundling" decisions, the court would have to find that CCD had protested in a timely manner, that the CBD announcements and the RFP provided inade-

7. Inasmuch as plaintiff admits to having seen the two CBD notices and was operating the civil engineering supply store at Tyndall, and, thus, was an integral part of the maintenance of base facilities, the court's credulity, apparently as was

that of the GAO, is tested by the plaintiff's assertion that CCD was completely unaware of the nature of the upcoming procurement activities at Tyndall.

quate notice to prospective bidders of what the Air Force planned to do, or that the plaintiff was prevented by the Air Force in some improper way from participating. As pointed out above, CCD brought its protest after reviewing the announcements in the CBD, after failing to request that it be placed on the mailing list, after not requesting a copy of the RFP, and without having submitted a proposal. Moreover, CCD appears to have filed its protest, first with the GAO, and then with this court, after communications with DEL–JEN, when the possibility of subcontracting the COCESS function was not resolved in their favor, and after CCD signed contract modifications indicating the final termination date for its COCESS function.

As noted above, CCD's June 6, 1997 protest to the GAO also was framed as based upon an alleged improper exclusion from the solicitation bidders' list, failure of the Air Force to solicit a proposal from CCD, improper CBD notices, and improper "bundling" of the COCESS function within the larger civil engineering functional area grouping. In denying CCD's protest, the GAO wrote:

> Our Bid Protest Regulations contain strict rules requiring timely submission of protests. These rules specifically require that protests based on alleged improprieties in a solicitation which are apparent prior to the closing time for receipt of proposals must be filed prior to that closing time. These timeliness rules reflect the dual requirements of giving parties a fair opportunity to present their cases and resolving protests expeditiously without unduly disrupting or delaying the procurement process.

*CC Distributors, Inc.,* Comp. Gen. Dec. B–277206, at 2 (July 17, 1997). *See also Custom Data Servs.,* Comp. Gen. Dec. B–271288.2, 96–2 CPD ¶ 140, at 2 (protest challenging agency's bundling of requirements dismissed as untimely where bundling approach was apparent from the face of the solicitation, and protest was not filed prior to time for receipt of proposals); *Allerion, Inc.,* Comp. Gen. Dec. B–256986, 94–1 CPD ¶ 281, at 3 n. 2 (protest of bundling of agency requirements apparent on the face of the CBD announcement dismissed as untimely).

In *Aerolease Long Beach v. United States,* 31 Fed.Cl. 342, 358 (1994), the court determined that it was appropriate to apply the GAO timeliness rule, described above in a case in which an offeror recognized an ambiguity in the solicitation, but failed to file a timely protest. It is likewise within the discretion of this court to rely on principles analogous to those recognized by the GAO. For many years, the courts in this Circuit have recognized a duty on the part of contractors to inquire and seek timely clarification and resolution of problems, inconsistencies, and discrepancies apparent in solicitations. "[W]hen [the contractor] is presented with an obvious omission, inconsistency, or discrepancy of significance, he must consult the Government's representatives if he intends to bridge the crevasse in his own favor. Having failed to take that route, plaintiff is now barred from recovering on this demand." *Beacon Constr. Co. v. United States,* 161 Ct.Cl. 1, 7, 314 F.2d 501, 504 (1963). *See also, Lockheed Martin IR Imaging Sys., Inc. v. West,* 108 F.3d 319, 322 (Fed.Cir.1997); *CACI Field Servs., Inc. v. United States,* 13 Cl.Ct. 718, 726–27 (1987), *aff'd,* 854 F.2d 464 (Fed.Cir.1988). The contention that CCD did not have adequate notice of the upcoming procurement on its incumbent responsibilities at Tyndall is without merit. Although the COCESS function and operation were not separately identified until late in the solicitation amendment process, the two CBD notices and the first version of the RFP sufficiently identified the civil engineering functions included in the RFP and should have put this plaintiff on notice that its COCESS contract in all probability would be impacted. Accordingly, because CCD opted not to inquire regarding the CBD notices or the RFP, opted not to submit a proposal, failed to timely protest the bundling or any other issue, it should not be allowed to do so at this late date.

### CONCLUSION

For the foregoing reasons, the defendant's motion to dismiss the complaint is, hereby,

GRANTED. The Clerk's Office, therefore, is directed to dismiss the plaintiff's complaint. No costs to either party.

IT IS SO ORDERED.