ALLIED TECHNOLOGY GROUP,
INC., Plaintiff,

v.

UNITED STATES, Defendant,

and

Computer Systems International,
Inc., Intervenor.

No. 97–143C.

United States Court of Federal Claims.

Sept. 12, 1997.

Joseph J. Petrillo, Petrillo & Associates, Washington, DC, attorney of record for plaintiff.

David B. Stinson, Commercial Litigation Branch, Civil Division, Department of Justice, with whom were David M. Cohen, Director, Civil Division, and Frank W. Hunger, Assistant Attorney General, attorneys of record for defendant. Lori S. Chofnas and Richard G. Welsh, Department of the Navy, of counsel.

Terence Murphy, Kaufman & Canoles, Norfolk, VA, attorney for intervenor.

## OPINION

HORN, Judge.

Allied Technology Group, Inc. (ATG) submitted a proposal in response to a Department of the Navy solicitation for the pre-installation coordination, refurbishment, and installation of the Joint Maritime Command Information System (JMCIS), fiber-optic systems, wide area networks, and local area networks onboard ships and at shore facilities. Contract award was made on November 21, 1996 to Computer Systems International, Inc. (CSI). The complaint in the above-captioned case originally was filed on March 5, 1997; an amended complaint was filed April 4, 1997. The complaint before the court does not request injunctive relief. The complaint is a protest after award, seeking a declaration that the Navy's cost evaluation of ATG's proposal was unlawful, termination of the award to CSI, a remand to the Department of the Navy for award of the contract to ATG, and award to ATG of costs and legal fees.

The defendant and the intervenor jointly filed a motion for summary judgment on May 9, 1997. The defendant and the intervenor CSI assert that the plaintiff cannot prove by clear and convincing evidence that the Navy's decision was arbitrary or capricious. The defendant and the intervenor also contend that if errors were made during proposal evaluations, they did not prejudice ATG, and that the award to CSI was proper and in compliance with the applicable laws and regulations. The defendant and the intervenor further argue that if the solicitation was unclear, the plaintiff had a duty to seek clarification of any discrepancies in the solicitation in a timely manner, but failed to do so.

ATG filed a cross-motion for summary judgment on May 13, 1997. ATG contends that, like CSI's proposal, its proposal was technically acceptable; that cost estimates drove the award decision; and that, had errors not been made in evaluating its cost proposal, ATG would have been recognized as having the lowest evaluated cost proposal and, thus, would have received the contract award. ATG alleges that errors occurred during the Navy's evaluation of overtime costs on each of the proposals submitted, and during the evaluation of warehousing costs in ATG's proposal. Additional reply briefs and documents were filed by all parties in May and June, 1997, until the most recent set of memoranda and documents was filed by each of the parties on June 27, 1997.

## FACTS

On October 25, 1995, the Fleet and Industrial Supply Center (FISC), Norfolk, Detachment Philadelphia, Department of the Navy, issued Solicitation No. N00140–96–R–E109, requesting proposals for the pre-installation coordination, refurbishment and installation

of the JMCIS, fiber optic systems, wide area networks, and local area networks onboard ships and at shore facilities. The solicitation contemplated an 8(a) set-aside in accordance with the Federal Acquisition Regulation (FAR), 48 C.F.R. § 6.204 (1996); a cost plus fixed fee, indefinite delivery/indefinite quantity, level of effort contract; and a procurement with a base year, and four one-year options, with the option years being evaluated.

The Navy's Request for Proposals indicated that award would be made to a responsible contractor, "whose offer, conforming to the solicitation, is determined most advantageous to the Government, cost/price and other factors considered." The solicitation also indicated that "[c]osts will be evaluated on the basis of cost realism. Cost realism pertains to the offeror's ability to project costs which are realistic and reasonable and which indicate that the offeror understands the nature and scope of work to be performed."

The first issue raised by the plaintiff at the agency level, and now with this court, concerns the Navy's evaluation of overtime hours. Plaintiff contends that overtime costs should not have been evaluated in the award competition at all. Initially, the defendant had evaluated overtime hours with overtime rates. After plaintiff's agency protest, the Navy recomputed overtime hours using straight time rates, which resulted in CSI still having the lowest evaluated cost proposal.

The Level of Effort clause in the solicitation, at Section B, "SUPPLIES/SERVICES AND PRICES," contains the Navy's estimate of labor hours required, divided by base and option years, by work site, by labor category, and by straight time and overtime hours. The solicitation defines "straight time" as a 40–hour work week in accordance with 48 C.F.R. § 22.103–1 (1996); "overtime" was defined as time worked in excess of the normal work week. The table of estimated labor hours included is several pages in length, but the introductory language and a sample of the first five entries (for illustrative purposes) is reproduced below:

LEVEL OF EFFORT (COST TYPE CONTRACT) (FISC DET PHILA) (OCT 1992)

(a) The level of effort for the performance of this contract during the period from the start of contract performance to *12* months thereafter is based upon *223,900* estimated manhours of direct labor. If all options are exercised by the government, the level of effort for the performance of this contract will be increased by an additional *895,600* estimated manhours of direct labor, for a total level of effort of *1,119,500* estimated manhours of direct labor (hereinafter referred to as the 'Estimated Total Hours') (emphasis in original).

(b) The estimated composition by labor category of the Estimated Total Hours is as follows:

| East Coast Labor | Lot I | Lot II | Lot III | Lot IV | Lot V |
|---|---|---|---|---|---|
| *Program Manager | 2000 | 2000 | 2000 | 2000 | 2000 |
| * Sr Elec/Mech Eng | 2000 | 2000 | 2000 | 2000 | 2000 |
| * Sr Elec/Mech Eng OT | 500 | 500 | 500 | 500 | 500 |
| * Elec/Mech Eng | 2000 | 2000 | 2000 | 2000 | 2000 |
| * Elec/Mech Eng OT | 500 | 500 | 500 | 500 | 500 |

* * *

Amendment 0004, effective on January 5, 1996, replaced the table originally issued in the solicitation. (Lot I represents the base year, Lots II–V represent the four option years, and "OT" is overtime.)

Also addressing overtime, Section M of the solicitation, titled "EVALUATION FACTORS FOR AWARD", at paragraph (3), reads:

(3) Costs will be evaluated on the basis of cost realism. Cost realism pertains to the offeror's ability to project costs which are realistic and reasonable and which indicate that the offeror understands the nature and scope of work to be performed.

Labor will be evaluated on the basis of 100% straight time. Uncompensated over-

time and overtime rates will not be used in the evaluation. Foe [sic] evaluation purposes, a full man year of effort equates to 1,920 hours.

Plaintiff points to the language in the last paragraph of Section M(3), which addresses straight time and overtime, to support its contention that overtime should not have been evaluated.

The second issue raised by the plaintiff at the agency level and in this court concerns the evaluation of warehousing costs. Plaintiff contends that its proposed overhead allocation for warehousing costs, and not the Navy's direct warehousing cost estimates provided in the solicitation, should have been evaluated in the award competition. In the solicitation at Section B, "SUPPLIES/SERVICES AND PRICES," in Section L's instructions to offerors on "SUBMISSION OF PROPOSALS," and at Section M's "EVALUATION CRITERIA FOR AWARD," dollar amounts for travel, material, and warehousing costs were provided by the Navy to be used by offerors in preparing their cost proposals.

Section B of the solicitation, titled "SUPPLIES/SERVICES AND PRICES," also includes the following language and table for the base year (similar provisions are included in the solicitation for subsequent option years):

3. Section B, "SUPPLIES/SERVICES AND PRICES" is hereby included in this amendment to allow for the submission of Best and Final Offers.

SECTION B–SUPPLIES/SERVICES AND PRICES [1]

| Item | Supplies/Services—LOT I | Qty. | Unit | Unit Price | Amount |
|---|---|---|---|---|---|
| 0001 | Technical support for the Joint Maritime Command Information Systems (JMCIS) Data Processing System in accordance with Section C for the period from 01 Nov 1996 through 12 months thereafter. | 1 | LT | | |
| 0002 | TECHNICAL DATA, IAW DD Form 1423 Exhibit A. | 1 | LT | NSP | NSP |
| 0003 | Estimated * MATERIAL in support of CLIN 0001. | 1 | LT | NTE | $2,000,000.00 |
| 0004 | Estimated * TRAVEL in support of CLIN 0001. | 1 | LT | NTE | $1,500,000.00 |
| 0005 | Estimated * WAREHOUSING in support of CLIN 0001. | 1 | LT | NTE | $ 600,000.00 |
| | Total Estimated Cost Fixed Fee | | | | |
| | Total Estimated CPFF | | | | |

* MATERIAL, TRAVEL AND WAREHOUSING SHALL BE BILLED AT ACTUAL COST PLUS GENERAL AND ADMINISTRATIVE COST, IF ANY. FEE SHALL NOT BE APPLIED TO THESE CONTRACT LINE ITEMS.

Section L of the solicitation, titled "INSTRUCTIONS, CONDITIONS AND NOTICES TO OFFERORS," provides that any offeror which includes Travel, Warehousing, or Material in its overhead costs should highlight that fact in its proposal, in order to "preclude these costs from being unduly considered in the Government's cost evaluation." Section L(III)(2)(g) contains the following language relevant to the issue of warehousing:

1. "LT" means lot, "NSP" means no separate price, and "NTE" means not to exceed.

(g) The following amounts (plus applicable G & A and Material Handling) shall be utilized for evaluation purposes only in determining total cost for entire contract.

|  | TRAVEL | WAREHOUSING | MATERIAL |
|---|---|---|---|
| Base Year | $1,500,000.00 | $600,000.00 | $2,000,000.00 |
| Option I | $1,550,000.00 | $625,000.00 | $2,150,000.00 |
| Option II | $1,600,000.00 | $650,000.00 | $2,300.000.00 |
| Option III | $1,650,000.00 | $675,000.00 | $2,450,000.00 |
| Option IV | $1,700,000.00 | $700,000.00 | $2,600,000.00 |

\* \* \*

(Iii) Any offeror having an accounting system which includes, within overhead or G & A, the cost elements set forth above shall *specifically* state this fact within the cost proposal. This will preclude these costs from being unduly considered in the Government's cost evaluation (emphasis in original).

In Section M of the solicitation, in the subsection titled "EVALUATION CRITERIA AND THE BASIS FOR AWARD (FISC DET PHILA) (OCT 1992)," the same dollar estimates for travel, warehousing and material costs were included, as were included in solicitation Sections B and L, but the accompanying language in Section M specified the use of the provided figures for evaluation of travel and material. The word "warehousing" is not specifically listed in the accompanying prose before or after the table of cost data. Section M(3) reads:

The Government has estimated travel and material costs as specified below:

|  | TRAVEL | WAREHOUSING | MATERIAL |
|---|---|---|---|
| Base Year | $1,500,000.00 | $600,000.00 | $2,000,000.00 |
| Option I | $1,550,000.00 | $625,000.00 | $2,150,000.00 |
| Option II | $1,600,000.00 | $650,000.00 | $2,300.000.00 |
| Option III | $1,650,000.00 | $675,000.00 | $2,450,000.00 |
| Option IV | $1,700,000.00 | $700,000.00 | $2,600,000.00 |

The Government's estimated travel and material costs (plus applicable burden) shall be used for the purpose of evaluating the cost/price proposal. Therefore, offerors must use these estimates in preparing their cost/price proposals. Application of material handling charges and/or G & A rates, as appropriate, will be allowed only if the contractor maintains separate accounts for such costs.

Nine proposals were received in response to the solicitation, including those from ATG and CSI. Four contractors, ATG, CSI, and two others, were determined by the contracting officer to be within the competitive range. In his Competitive Range Determination, the contracting officer indicated that both the ATG and CSI cost proposals were within the competitive range, but were unacceptable, and that, therefore, meaningful cost realism analyses could not be performed at that stage. Discussions with each of the four remaining offerors were conducted individually. During discussions, the Navy requested additional data from both ATG and CSI. Neither the warehousing nor the overtime questions at issue in the above-captioned case were addressed by either the plaintiff or the defendant during the discussions of ATG's proposal prior to submission of the Best and Final Offers (BAFOs). The BAFOs were timely submitted. Each of the BAFOs, including those from ATG and CSI, were rated technically acceptable.

After the solicitation was issued, but before proposals were submitted on November 7, 1995, ATG addressed this question to the Navy: "[c]ost proposal evaluation states that labor will be evaluated at 100% straight time and that overtime will not be evaluated. Should the total lot price include the amount estimated for overtime or should it only include straight time?" The Navy responded to the question by issuing Amendment 0004 to the Solicitation, effective January 5, 1996, stating: "[t]he solicitation is clear on its face." On November 17, 1995, another contractor also posed questions to the Navy

regarding how the government was planning to evaluate overtime rates, and the Navy similarly responded that the solicitation was clear on its face.

After evaluation of the BAFOs, the contracting officer determined that the contract should be awarded to CSI, since based on the Navy's cost realism analysis, all four contractors in the competitive range had acceptable technical ratings and CSI had submitted the lowest cost proposal. The contract was awarded to CSI on November 21, 1996. ATG was notified of the award to CSI by letter dated the same day. ATG requested a debriefing, which was conducted by the contracting officer on December 3, 1996. During the debriefing, ATG was informed that overtime hours in all of the proposals submitted had been evaluated using overtime rates. ATG objected that this approach conflicted with its understanding of the directions contained in the solicitation regarding the evaluation methodology in clause M(3). ATG argued that, based on clause M(3), the cost of overtime hours should not be included in the cost evaluation. ATG also became concerned that its warehousing costs had been double counted (*i.e.,* counted as both a direct and an indirect cost).

Believing that it should have been evaluated as having the lowest cost proposal, ATG submitted an agency-level protest after award, by letter dated December 17, 1996, based on both the overtime and warehousing cost issues. Because ATG had proposed separate straight time and overtime costs, and the overhead costs included a premium, plaintiff argued that the separation of straight time and overtime costs was provided for the convenience of cost evaluators. ATG alleges that it relied on the language of the solicitation (that "[l]abor will be evaluated on the basis of 100% straight time ... overtime rates will not be used in the evaluation"), and concluded that overtime would not be considered as part of the cost numbers used during the evaluation of costs. ATG also argued that it had used the Navy's estimates for travel, warehousing, and material in both its initial proposal and BAFO, but had noted both times that it also had included warehousing costs in an overhead

pool, and had informed the Navy that: "to the extent that these costs [plaintiff's indirect warehousing costs] are included in warehousing ... our proposal should be reduced."

The Navy's response to ATG's agency-level protest after award was to re-examine the overtime cost analysis the Navy had performed. Overtime hours in each of the BAFOs were reevaluated at straight time rates, minus the overtime premiums. On that basis, on January 23, 1997, the Navy denied the protest, explaining that CSI's proposal still represented the lowest evaluated cost, and that even if ATG's own figures on warehousing costs were accepted (although the contracting officer declined to accept them), CSI would remain the selectee for the contract award.

By letter dated January 31, 1997, ATG requested reconsideration of its protest. By letter dated February 19, 1997, the Navy responded to ATG that it would not change its decision to award the JMCIS contract to CSI. In the letter, the Navy also indicated that the "suggestion that the hours designated in the solicitation as overtime hours should not be evaluated at all is completely contrary to the terms of the solicitation and the overall purposes of conducting a cost realism analysis."

The parties to the above-captioned lawsuit have stipulated as to the four potential outcomes of a re-evaluation of the overtime and warehousing cost rates: (1) if overtime hours and costs are excluded from all proposals, and if the Navy's estimated direct warehouse costs are also excluded from the evaluation of ATG's proposal, so that only ATG's indirect or overhead warehousing costs are employed, ATG will have the lowest evaluated cost proposal; (2) if overtime hours are evaluated, but at straight time rates rather than overtime rates, in all proposals, and if direct warehousing costs are again excluded from ATG's proposal, CSI's proposal will remain the lowest evaluated cost; (3) if overtime hours and costs are excluded from all proposals, and if the difference between the Navy's estimated direct warehousing costs (plus material handling fee) and plaintiff's warehousing costs included in its overhead (plus applicable indirect costs), were included in the

cost analysis, CSI's proposal will remain the lowest evaluated cost; and (4) if overtime hours are evaluated at straight time rates, and if the difference between the Navy's estimated direct warehousing costs (plus material handling fee) and plaintiff's warehousing costs included in its overhead (plus applicable indirect costs), were included in the cost analysis, CSI's proposal will remain the lowest evaluated cost. Thus, by the stipulation of the parties, plaintiff must prevail on both the overtime and the warehousing issues in order to have submitted the lowest evaluated cost proposal.

### DISCUSSION

■ The Administrative Dispute Resolution Act of 1996, Pub.L. No. 104–320, §§ 12(a), 12(b), 110 Stat. 3870, 3874 (1996), amended the Tucker Act and provided the United States Court of Federal Claims with federal procurement post-award bid protest jurisdiction, concurrent with that of federal district courts, for actions filed on or after December 31, 1996. *See* 28 U.S.C.A. § 1491(b)(1)-(4) (West Supp.1997); *CC Distributors, Inc. v. United States,* 38 Fed.Cl. 771 (1997); *Day & Zimmerman Servs. v. United States,* 38 Fed.Cl. 591, 597–98 (1997); *ATA Defense Indus., Inc. v. United States,* 38 Fed.Cl. 489, 493–94 (1997); *GraphicData, LLC v. United States,* 37 Fed.Cl. 771, 778 (1997); *Cincom Sys., Inc. v. United States,* 37 Fed.Cl. 266, 267 (1997), 37 Fed.Cl. 663, 669 (1997); *Cubic Applications, Inc. v. United States,* 37 Fed.Cl. 339, 341 (1997), 37 Fed.Cl. 345, 349 (1997). The revised section of the statute, which confers post-award bid protest jurisdiction on the United States Court of Federal Claims states:

> (b)(1) Both the Unites [sic] States Court of Federal Claims and the district courts of the United States shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. Both the United States Court of Federal Claims and the district

> courts of the United States shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.

28 U.S.C.A. § 1491(b)(1) (West Supp.1997). The amended statute provides that post-award agency procurement decisions are to be reviewed under the Administrative Procedure Act standards contained in 5 U.S.C. § 706 (1994). Agency procurement actions may be set aside when they are determined to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

■ The solicitation in the above-captioned case contemplated a negotiated procurement, in which contracting officers are generally afforded greater discretion, in comparison to their role in sealed bid procurements. "It is well-established that contracting officials are accorded broad discretion in conducting a negotiated procurement...." *Hayes Int'l Corp. v. United States,* 7 Cl.Ct. 681, 686 (1985) (citing *Sperry Flight Sys. v. United States,* 212 Ct.Cl. 329, 339–40, 548 F.2d 915, 921 (1977)). In *Burroughs Corp. v. United States,* 223 Ct.Cl. 53, 617 F.2d 590 (1980), the court described the broad discretion afforded a contracting officer in a negotiated procurement, as follows:

> Remarking on the contracting officer's discretion in negotiation the court in *Sperry Flight Systems Division v. United States,* 212 Ct.Cl. 329, 339, 548 F.2d 915, 921 (1977) noted that '... the decision to contract—a responsibility that rests with the contracting officer alone—is inherently a judgmental process which cannot accommodate itself to absolutes, at least not without severely impairing the quality of the judgment called for ...' and that, 'effective contracting demands broad discretion.' Because of the breadth of discretion given to the contracting officer in negotiated procurement, the burden of showing this discretion was abused, and that the action was 'arbitrary and capricious' is certainly much heavier than it would be in a case of formal advertising. *See Keco II,* 203 Ct.Cl. [at] 574, 492 F.2d at 1204.

*Id.* at 65, 617 F.2d at 598.

More recently, the United States Court of Appeals for the Federal Circuit reaffirmed the principle and stated:

Effective contracting demands broad discretion. *Burroughs Corp. v. United States*, 223 Ct.Cl. 53, 617 F.2d 590, 598 (1980); *Sperry Flight Sys. Div. v. United States*, 548 F.2d 915, 921, 212 Ct.Cl. 329 (1977); see *NKF Eng'g. Inc. v. United States*, 805 F.2d 372, 377 (Fed.Cir.1986); *Tidewater Management Servs., Inc. v. United States*, 573 F.2d 65, 73, 216 Ct.Cl. 69 (1978); *RADVA Corp. v. United States*, 17 Cl.Ct. 812, 819 (1989), *aff'd*, 914 F.2d 271 (Fed.Cir.1990). Accordingly, agencies 'are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government.' *Tidewater Management Servs.*, 573 F.2d at 73, 216 Ct.Cl. 69.

*Lockheed Missiles & Space Co., Inc. v. Bentsen*, 4 F.3d 955, 958–59 (Fed.Cir.1993).

■ The Court of Claims, in *Keco Indus., Inc. v. United States*, 203 Ct.Cl. 566, 492 F.2d 1200 (1974) (*Keco II* ), set forth four factors to be considered when determining whether the government has acted arbitrarily or capriciously towards a bidder-claimant: (1) whether there was subjective bad faith on the part of the procuring officials, thus, depriving the bidder of fair and honest consideration of its proposal; (2) whether there was a reasonable basis for the administrative decision; (3) the degree of discretion given to the procurement officials by applicable statutes and regulations which, under *Keco II*, determines the degree of proof of error necessary to demonstrate a right to recovery; and (4) whether government officials violated pertinent statutes or regulations, which, if violated, may form the basis for recovery, but need not do so automatically. *Id.* at 574, 492 F.2d at 1203–04; *see also E.W. Bliss Co. v. United States*, 77 F.3d 445, 447 (Fed.Cir. 1996); *Aerolease Long Beach v. United States*, 31 Fed.Cl. 342, 355–56 (1994), *aff'd*, 39 F.3d 1198 (Fed.Cir.1994); *Burroughs Corp. v. United States*, 223 Ct.Cl. 53, 64–65, 617 F.2d 590, 597 (1980) (applying *Keco II* criteria).

In the instant case, plaintiff contends that the Navy did not evaluate the proposals in accordance with the criteria established in the solicitation, and relies on 10 U.S.C.A. § 2305(a)(2)(A) (West Supp.1997), which states:

> (2) In addition to the specifications described in paragraph (1), a solicitation for sealed bids or competitive proposals (other than for a procurement for commercial items using special simplified procedures or a purchase for an amount not greater than the simplified acquisition threshold) shall at a minimum include—
>
> (A) a statement of—
>
> (i) all significant factors and significant subfactors which the head of the agency reasonably expects to consider in evaluating sealed bids (including price) or competitive proposals (including cost or price, cost-related or price-related factors and subfactors, and noncost-related or nonprice-related factors and subfactors);
>
> (ii) the relative importance assigned to each of those factors and subfactors;
>
> *   *   *   *   *   *

This legislation is implemented at 48 C.F.R. § 15.605(d)(1), which similarly provides that:

> At a minimum, the solicitation shall clearly state the significant evaluation factors, such as cost or price, cost or price-related factors, past performance and other non-cost or non-price-related factors, and any significant subfactors, that will be considered in making the source selection, and their relative importance.

48 C.F.R. § 15.605(d)(1) (1996). Plaintiff also cites to 48 C.F.R. § 15.608(a), which states:

> Proposal evaluation is an assessment of both the proposal and the offeror's ability to successfully accomplish the prospective contract. An agency shall evaluate competitive proposals solely on the factors specified in the solicitation.

48 C.F.R. § 15.608(a) (1996).

■ To establish an abuse of discretion and to prevail in a bid protest, case authority requires both a violation of applicable statute or regulation, and resulting prejudice to the protester. According to the United States Court of Appeals for the Federal Circuit:

As Data General recognizes, to prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it. *See LaBarge Prods., Inc. v. West*, 46 F.3d 1547, 1556 (Fed.Cir.1995) ('Even though the disclosures to Victaulic clearly violated the FAR.... LaBarge was not harmed by the disclosures in any concrete way contemplated by the FAR and, therefore, is not entitled to relief.'); *Central Ark. Maintenance, Inc. v. United States*, 68 F.3d 1338, 1342 (Fed.Cir.1995) (stating in a pre-award bid protest that 'not all violations of statute and regulation are the same; only a "clear and prejudicial" violation of a procurement statute or regulation warrants relief'); *Cleveland Telecommunications Corp. v. Goldin*, 43 F.3d 655, 659 (Fed.Cir.1994) (a possible regulatory violation 'did not prejudice [pre-award bid protester] in any way and does not provide grounds for terminating the procurement'); *CACI Field Servs., Inc. v. United States*, 854 F.2d 464, 466 (Fed.Cir.1988) (aggrieved bidder in a pre-award bid protest 'was required to prove at trial a "clear and prejudicial" violation of a procurement statute or regulation'); *TRW Envtl. Safety Sys., Inc. v. United States*, 18 Cl.Ct. 33, 67 (1989) ('Generally, the requirement of proving prejudice prevents an unsuccessful bidder from overturning a contract award due to a harmless violation of a statute or regulation on the part of the government').

*Data General Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed.Cir.1996).

■ In another case, the same court stated:

A protestor bears the burden of proving error in the procurement process sufficient to justify relief. *CACI Field Servs.*, 854 F.2d at 466. Not every error compels the rejection of an award. *See SMS Data Prods. Group, Inc. v. United States*, 900 F.2d 1553, 1557 (Fed.Cir.1990); *Excavation Constr., Inc. v. United States*, 204 Ct.Cl. 299, 494 F.2d 1289, 1293 (1974); 40 U.S.C. § 759(f)(5)(B) (1994). The Board must consider the significance of errors in the procurement process when deciding whether the overturning of an award is

appropriate. *Data General Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed.Cir.1996); *Andersen Consulting v. United States*, 959 F.2d 929, 932–33, 935 (Fed.Cir.1992). We have held that *de minimis* errors do not require the overturning of an award. *Andersen Consulting*, 959 F.2d at 932–33, 935. 'De minimis errors are those that are so insignificant when considered against the solicitation as a whole that they can safely be ignored and the main purposes of the contemplated contract will not be affected if they are.' *Id.* at 935.

*Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 1000 (Fed.Cir.1996). An offeror is not required to demonstrate that "but for" the violation, the offeror would have received the contract award; at the other extreme, the "mere possibility" of receiving the award is not enough to demonstrate prejudice. The proper standard lies between these formulations:

We think that the appropriate standard is that, to establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protestor would have been awarded the contract.

This is a refinement and clarification of the 'substantial chance' language of *CACI, Inc.–Fed.*, 719 F.2d at 1574. The standard reflects a reasonable balance between the importance of (1) averting unwarranted interruptions of and interferences with the procurement process and (2) ensuring that protesters who have been adversely affected by allegedly significant error in the procurement process have a forum available to vent their grievances.

*Data General Corp. v. Johnson*, 78 F.3d at 1562–63 (reformulating the test from *CACI, Inc.–Fed. v. United States*, 719 F.2d 1567, 1574 (Fed.Cir.1983), which required the protester to have a "substantial chance" for award to demonstrate prejudice).

■ The parties in the above-captioned case have filed cross-motions for summary judgment. Summary judgment in this court should be granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a

matter of law. Rule 56 of the Rules of the Court of Federal Claims (RCFC) is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) and is similar in language and effect.[2] Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Rule 56(c) provides that in order for a motion for summary judgment to be granted, the moving party bears the burden of demonstrating that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Creppel v. United States,* 41 F.3d 627, 630–31 (Fed.Cir.1994); *Meyers v. Asics Corp.,* 974 F.2d 1304, 1306 (Fed.Cir.1992); *Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States,* 20 Cl.Ct. 674, 679 (1990), *aff'd,* 944 F.2d 885 (Fed.Cir.1991); *Rust Communications Group, Inc. v. United States,* 20 Cl.Ct. 392, 394 (1990). Disputes over facts which are not outcome determinative under the governing law will not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury [trier of fact] could return a verdict for the nonmoving party." *Id.; see also Uniq Computer Corp. v. United States,* 20 Cl.Ct. 222, 228–29 (1990).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249, 106 S.Ct. at 2510–11; *see, e.g., Cloutier v. United States,* 19 Cl.Ct. 326, 328 (1990),

*aff'd without op.,* 937 F.2d 622 (Fed.Cir. 1991). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 250–52, 106 S.Ct. at 2511–12. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Stated otherwise, if the nonmoving party cannot present evidence to support its case under any scenario, then there should be no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings.

If, however, the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Id.; see also Litton Indus. Prods., Inc. v. Solid State Sys. Corp.,* 755 F.2d 158, 163 (Fed.Cir.1985); *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

The initial burden on the party moving for summary judgment, to produce evidence showing the absence of a genuine issue of material fact, may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986); *see also Lima Surgical Assocs.,* 20 Cl.Ct. at 679. If the moving party makes such a showing, the burden then shifts to the nonmoving party to demonstrate that a genuine factual dispute exists by pre-

---

**2.** In general, the rules of this court are patterned on the Federal Rules of Civil Procedure. Therefore, precedent under the Federal Rules of Civil Procedure is relevant to interpreting the rules of this court, including RCFC 56. *See Jay v. Sec'y*

*DHHS,* 998 F.2d 979, 982 (Fed.Cir.1993); *Imperial Van Lines Int'l, Inc. v. United States,* 821 F.2d 634, 637 (Fed.Cir.1987); *Lichtefeld–Massaro, Inc. v. United States,* 17 Cl.Ct. 67, 70 (1989).

senting evidence which establishes the existence of an element of its case upon which it bears the burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. at 2552; *Lima Surgical Assocs.,* 20 Cl.Ct. at 679.

Pursuant to Rule 56, the motion for summary judgment may succeed, whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file. *Celotex Corp. v. Catrett,* 477 U.S. at 324, 106 S.Ct. at 2553. Generally, however, in order to prevail, by demonstrating that a genuine issue for trial exists, the nonmoving party will need to go beyond the pleadings, by use of evidence such as affidavits, depositions, answers to interrogatories, and admissions. *Id.*

The fact that both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, however, does not relieve the court of its responsibility to determine the appropriateness of summary disposition in the particular case. *Prineville Sawmill Co. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987)). "[S]imply because both parties moved for summary judgment, it does not follow that summary judgment should be granted one or the other." *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.,* 401 F.2d 689, 692 (4th Cir.1968), *cert. denied,* 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969); *see also Levine v. Fairleigh Dickinson Univ.,* 646 F.2d 825, 833 (3d Cir.1981); *Home Ins. Co. v. Aetna Casualty & Sur. Co.,* 528 F.2d 1388, 1390 (2d Cir.1976). Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment. The making of such inherently contradictory claims, however, does not establish that if one is rejected the other is necessarily justified. *Rains v. Cascade Indus., Inc.,* 402 F.2d 241, 245 (3d Cir.1968); *Bataco Indus., Inc. v. United States,* 29 Fed. Cl. 318, 322 (1993), *aff'd without op.,* 31 F.3d 1176 (Fed.Cir.1994). The court must evaluate each party's motion on its own merit, taking care to draw all reasonable inferences against the party whose motion is under consideration. *Mingus Constructors, Inc.,* 812 F.2d at 1391.

In the above-captioned case, the parties have filed joint stipulations of fact, and fundamentally agree that summary judgment disposition is appropriate. Plaintiff, however, raises, almost in passing, a possible qualification as to whether summary judgment is appropriate in the following brief paragraph and associated footnote:

> However, the record is not adequate to grant summary judgment to Defendant and Intervenor. For instance, they suggest that the proper method of adjusting Plaintiff's warehousing costs is to back out the amounts included in overhead, since there are 'other costs' associated with warehousing. Assuming that Defendant and Intervenor are correct, then the record is silent about what these 'other costs' might be, both in nature and amount. Until these costs are established, summary judgment is not appropriate.

The plaintiff's footnote reads: "Plaintiff maintains that the silence of the record on this point is probative that there are no such 'other costs' and that this issue is a red herring." The court finds, however, that the joint stipulations of fact and the record provide an adequate basis for summary decision. Any possible lingering disagreements on calculations of warehousing costs in the above-captioned case would not impact materially the determination of which offeror had submitted the lowest evaluated cost proposal, and whether plaintiff was prejudiced by the evaluation of proposals conducted by the Navy.

### Overtime Costs

■ In the above-captioned case, the plaintiff argues that the Navy should not have evaluated overtime hours at all, with either overtime rates or with straight time rates. According to the plaintiff, because an overtime rate is composed of a straight time rate with an overtime premium, and Section M of the evaluation criteria in the solicitation states that "overtime rates will not be used in the evaluation," neither overtime rates nor straight time rates should be considered

when computing overtime hours.[3] The defendant and the intervenor, however, respond that the language in Section M of the solicitation criteria is explicit and that evaluation of overtime hours at straight time rates is within the scope of these words, since the language only precludes use of overtime rates. Moreover, the defendant and the intervenor argue that it is inconsistent with cost realism principles not to evaluate overtime hours.

The defendant and the intervenor also contend that plaintiff's protest as to overtime costs is barred, as not having been raised in a timely manner. The defendant and the intervenor argue that a protester may waive the right to challenge defects which are apparent in a solicitation, after the agency and other offerors have proceeded through a laborious and costly offer and evaluation process, on the theory that permitting a protest after submission of proposals, even an otherwise bonafide one, may needlessly disrupt the procurement process.

The solicitation, when issued, included an overtime clause, "PAYMENT FOR OVER-TIME PREMIUMS (JUL 1990)," 48 C.F.R. § 52.222–2 (1996), found in Section I, "CLAUSES AND PROVISIONS," which authorizes overtime under specified conditions, so long as properly justified. Furthermore, overtime and straight time are defined in section C7 of the solicitation, as follows:

*Definition of Straight Time and Overtime*

Straight Time is defined as a work week of 40 hours (in accordance with FAR 22.103–1).

Overtime is defined as any time worked by a Contractor's employee in excess of the employee's normal work week (in accordance with FAR 22.103–1). Overtime shall be used only upon prior approval by the Ordering Officer.

Moreover, Section B of the solicitation (SUPPLIES/SERVICES AND PRICES) contains a Level of Effort clause, as modified by solicitation amendment 0004, provides in part:

LEVEL OF EFFORT (COST TYPE CONTRACT) (FISC DET PHILA) (OCT 1992)

(a) The level of effort for the performance of this contract during the period from the start of contract performance to *12* months thereafter is based upon *223,900* estimated manhours of direct labor. If all options are exercised by the government, the level of effort for the performance of this contract will be increased by an additional *895,600* estimated manhours of direct labor, for a total level of effort of *1,119,500* estimated manhours of direct labor (hereinafter referred to as the 'Estimated Total Hours').

(b) The estimated composition by labor category of the Estimated Total Hours is as follows: [4]

| East Coast Labor | Lot I | Lot II | Lot III | Lot IV | Lot V |
|---|---|---|---|---|---|
| * Program Manager | 2000 | 2000 | 2000 | 2000 | 2000 |
| * Sr Elec/Mech Eng | 2000 | 2000 | 2000 | 2000 | 2000 |
| * Sr Elec/Mech Eng OT | 500 | 500 | 500 | 500 | 500 |
| * Elec/Mech Eng | 2000 | 2000 | 2000 | 2000 | 2000 |
| * Elec/Mech Eng OT | 500 | 500 | 500 | 500 | 500 |

\* \* \*

**3.** Plaintiff also argues that payment of overtime hours at straight time rates for non-exempt employees would violate the Service Contract Act, 41 U.S.C. § 35 *et seq.* (1994) and the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* (1994). Although perhaps illogical on the part of the government, the employment by the government of straight time rates to evaluate overtime hours is not a mandate for an awardee to pay employees at straight time rates when overtime rates are required to be paid by statute. As long as clearly stated, the government may require a prospective offeror to conform a proposal to unusual requirements. Furthermore, as discussed below, the mixed and even contradictory signals included in the solicitation in the instant case required prospective offerors to inquire and seek clarification of the inconsistency in order to resolve ambiguities in the solicitation prior to submitting a proposal.

**4.** "OT" is the reference used in the solicitation to identify overtime. Moreover, the table included in the solicitation is longer than what appears above, which includes only the introductory lan-

(Emphasis in original.) As reflected in paragraph 7 of a pre-solicitation "Determination To Authorize Use of Overtime in Fleet and Technical Support Center Service Contract," prepared by the Navy, but not released to the public, the Navy estimated that the ratio of straight time to overtime hours was 2.2:1, reflecting a significant amount of contemplated overtime.[5]

Clearly, the solicitation invited prospective contractors to include overtime in their proposals. All offerors did so, including ATG. Moreover, initially, the Navy evaluated overtime hours, using overtime rates.

In spite of the indications, both public and private, of the Navy's apparent intent to evaluate overtime for the contract award competition, the solicitation contains the following language in Section M, "EVALUATION FACTORS FOR AWARD":

> Labor will be evaluated on the basis of 100% straight time. Uncompensated overtime and overtime rates will not be used in the evaluation.

As to cost realism, the solicitation's Section L, "INSTRUCTIONS, CONDITIONS AND NOTICES TO OFFERORS," provides that:

---

guage and a sample of the first five entries (for illustrative purposes).

5. On October 25, 1995, when the solicitation was issued, the contracting officer and the chief of the purchasing office had signed a pre-solicitation "Determination to Authorize Use of Overtime in Fleet and Technical Support Center Service Contract," which provided in part:

> 3. Due to the critical nature of many of the above tasks, overtime is required in instances as noted on specific delivery orders to:
> a. Meet critical operational deadlines that affect urgent fleet readiness.
> b. Handle emergencies.
> c. Safeguard life and property.
> d. Provide a cost savings when clearly demonstrated by the use of overtime.
> e. Perform installations while ship is deployed.
>
>        \*      \*      \*
>
> 4. Essential deliveries and performance schedules will be determined by Government CORs [contracting officer representatives] knowledgeable of the program or project requirements. These CORs will determine the need for overtime based on the above criteria in paragraph 3 and will provide justification for the use of overtime to the Ordering/Contracting Officer. The CORs will monitor contractor's progress, and review deliverables to ensure that products and services received by the Government meet applicable standards and specifications.
> 5. Alternatives in lieu of overtime have been considered. In many cases, straight time cannot be extended to meet operational deadlines mandated by Type Commands and Program Office sponsors. Additionally space limitations onboard ships frequently preclude the use of additional personnel to accomplish task utilizing straight time within ship's availability. Onboard installations and technical assistance for the JMCIS equipment being supported by the Request for Procurement, must be provided based on the ship's availability, schedule and mission purpose. Ship's availability for surface combat ships are typically short in duration and subject to short notice change of

schedule. It is necessary to respond to ... urgent technical assistance requests in an appropriate time frame that may require the use of overtime. If straight time can be utilized to accomplish the tasking without impacting on critical operations, the COR will not have justification to request overtime based on the criteria in paragraph 3 above.

       \*      \*      \*

In all cases, the COR must determine if overtime is required, and submit proper justification for overtime on each delivery order.

5. [sic] The estimated overtime for this Request for Procurement is based on historical overtime usage under the current Indefinite Delivery Indefinite Quantity Time and Material Contract (NO01 89–93–D–0243) that supports this tasking and provides a similar cadre of support to the government.

       \*      \*      \*

7. The straight time to overtime hours and their ratio for this Request for Contractual Procurement is as follows:

| PERIOD/ TIME | STRAIGHT TIME | OVERTIME | RATIO ST/OT |
|---|---|---|---|
| LOT I | 154, 500 | 69, 400 | 2.2:1 |
| LOT II | 154, 500 | 69, 400 | 2.2:1 |
| LOT III | 154, 500 | 69, 400 | 2.2:1 |
| LOT IV | 154, 500 | 69, 400 | 2.2:1 |
| LOT V | 154, 500 | 69, 400 | 2.2:1 |

This unusually high ratio of straight time to overtime is supported by historical data that has required most installations for large ships (i.e. aircraft carriers and LHAs) to be accomplished while ships were deployed. It has been demonstrated to be in the government's best interest to limit the time that installation teams must be onboard by working overtime. Limiting this onboard time reduces the disruption of ship's activities. Another factor contributing to this ratio is the number of installations being performed overseas. It has again been determined to be in the government's best interest to utilize overtime to reduce the amount of time that per diem must be expended.

(e) Cost Realism. Offeror's cost proposals will be evaluated for cost realism. All offeror's shall provide a separate discussion within their cost proposal that addresses the basis and methodology used by the offeror in determining the anticipated projected costs. This discussion should address the validity of the methodology used, the offeror's prior experience and expertise in the use of the methodology and, to the extent applicable, cite specific examples that provide the basis to judge the accuracy of the proposed costs.

Section M, "EVALUATION FACTORS FOR AWARD," which includes the language that "labor would be evaluated on the basis of 100% straight time," added cost realism instructions:

(3) Costs will be evaluated on the basis of cost realism. Cost realism pertains to the offeror's ability to project costs which are realistic and reasonable and which indicate that the offeror understands the nature and scope of work to be performed.

Labor will be evaluated on the basis of 100% straight time. Uncompensated overtime and overtime rates will not be used in the evaluation. Foe [sic] evaluation purposes, a full man year of effort equates to 1, 920 hours.

Evaluation of personnel compensation rates will be part of the cost realism evaluation. Unrealistic rates, as determined by the Contracting Officer, may also be considered in risk assessment and may result in a reduced technical score.

*See also* 48 C.F.R. § 15.605(b)(2), (c) (1996).

The guiding principles which control the interpretation of government contracts and solicitations often have been considered largely interchangeable as part of the legal tradition which attaches to interpreting the contractual documents which form the agreement between the parties. In part, this tradition may have developed because substantial portions of solicitations are incorporated into final contracts. When interpreting the language of a contract, a court must give reasonable meaning to all parts of the contract and not render portions of the contract meaningless. *Fortec Constructors v. United States,* 760 F.2d 1288, 1292 (Fed.Cir.1985);

United States v. Johnson Controls, Inc., 713 F.2d 1541, 1555 (Fed.Cir.1983). Otherwise stated, to ascertain the intentions of the parties, the contract should be construed in its entirety "so as to harmonize and give meaning to all its provisions." *Thanet Corp. v. United States,* 219 Ct.Cl. 75, 82, 591 F.2d 629, 633 (1979); *ITT Arctic Servs., Inc. v. United States,* 207 Ct.Cl. 743, 751–52, 524 F.2d 680 (1975); *accord Firestone Tire & Rubber Co. v. United States,* 195 Ct.Cl. 21, 30, 444 F.2d 547, 551 (1971). The language of a contract, moreover, must be given the meaning that would be derived from the contract by a "reasonably intelligent person acquainted with the contemporaneous circumstances." *Hol–Gar Mfg. Corp. v. United States,* 169 Ct.Cl. 384, 388, 351 F.2d 972, 975 (1965).

When a disagreement regarding the meaning of the words in a contract is presented to a court, the interpretation of the words included in a contract is a two-step process. The court must determine first whether an ambiguity exists. *John C. Grimberg Co., Inc. v. United States,* 7 Cl.Ct. 452, 456 (1985), *aff'd without op.,* 785 F.2d 325 (Fed.Cir. 1985). If an ambiguity is immediately apparent, it is sometimes referred to as a patent ambiguity, and the plaintiff is under a duty to seek clarification. *George E. Newsom v. United States,* 230 Ct.Cl. 301, 303, 676 F.2d 647, 650 (1982). Although a potential contractor has some responsibility to inquire about a major patent discrepancy, omission or conflicts in the provisions, the contractor is not normally required to seek clarification of "any and all ambiguities, doubts, or possible differences in interpretation." *WPC Enterprises, Inc. v. United States,* 163 Ct.Cl. 1, 6, 323 F.2d 874, 877 (1963). If the plaintiff, however, does not inquire about a patent ambiguity, then the ambiguity will be construed against the plaintiff. If, however, the ambiguity is not patent, then the non-patent ambiguity will be interpreted against the drafter of the contract, so long as the other party's interpretation is a reasonable one. *E.g., Perry & Wallis, Inc. v. United States,* 192 Ct.Cl. 310, 316, 427 F.2d 722, 726 (1970). The alternative interpretation, however, must be within the "zone of reasonableness."

*WPC Enterprises, Inc. v. United States,* 163 Ct.Cl. at 6, 323 F.2d at 877.

Whenever possible, courts look to a "plain language" or "plain meaning" interpretation of contractual documents. *Aleman Food Servs., Inc. v. United States,* 994 F.2d 819, 822 (Fed.Cir.1993); *Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed.Cir.1991). The ordinary meaning of the language in contractual documents governs, and not a party's subjective but unexpressed intent. *International Transducer Corp. v. United States,* 30 Fed.Cl. 522, 526–27 (1994). "Reasonableness is the standard." *Id.* at 527.

The documents and events which resulted in the above-captioned case present a disorganized and contradictory picture of an agency which projected confused signals. Although not made public, and, therefore, not part of the developing understanding of plaintiff or any other offeror at the time they submitted their proposals, the Navy's pre-award determination to use overtime suggests an agency which appears to have intended to evaluate overtime. Moreover, the solicitation's announced demand for inclusion by prospective offerors of overtime data in their proposals, the high estimated ratio of overtime hours to straight time hours (1.2:2) described in the solicitation, and the emphasis in the solicitation upon cost realism were in contradiction with the words of section M of the evaluation criteria. Whereas, taken alone, the words of section M may have been clear, the words of the total solicitation package were ambiguous and sent mixed and puzzling signals to the prospective offerors. In fact, all of the offerors responded to the solicitation by submitting proposals which included overtime numbers. The defendant, which should take no pride in the confusion it created, however, now argues, along with the intervenor, that plaintiff's protest before this court regarding the overtime issue is time-barred.

In circumstances when the solicitation presents significant mixed signals, a contractor has a duty to inquire and seek clarification of those patent ambiguities in a solicitation. In *Beacon Construction Co. v. United States,* the court held that when a contractor is on notice of an "incipient problem," or of "surficial inconsistencies" in the solicitation, but fails to resolve it with the contracting officer, the contractor "cannot rely on the principle that ambiguities in contracts written by the government are held against the drafter." *Beacon Constr. Co. v. United States,* 161 Ct.Cl. 1, 7, 314 F.2d 501, 504 (1963) (citation omitted). The *Beacon* court also wrote:

> (W)hen [the contractor] is presented with an obvious omission, inconsistency, or discrepancy of significance, he must consult the Government's representatives if he intends to bridge the crevasse in his own favor. Having failed to take that route, plaintiff is now barred from recovering on this demand.

*Id. See also United Int'l Investigative Servs. v. United States,* 109 F.3d 734, 738 (Fed.Cir. 1997); *Lockheed Martin IR Imaging Sys., Inc. v. West,* 108 F.3d 319, 322 (Fed.Cir. 1997); *S.J. Amoroso Constr. Co., Inc. v. United States,* 12 F.3d 1072, 1076 (Fed.Cir. 1993); *Community Heating & Plumbing Co., Inc. v. Kelso,* 987 F.2d 1575, 1579–80 (Fed.Cir.1993). In *CACI Field Services, Inc. v. United States,* the court wrote: "Assuming that CACI's interpretation ... indicated that the list of evaluation factors was, at most, ambiguous, the burden was on CACI to seek a clarification from the CO [contracting officer] regarding that ambiguity." *CACI Field Servs., Inc. v. United States,* 13 Cl.Ct. 718, 726–27 (1987), *aff'd* 854 F.2d 464 (Fed.Cir. 1988). Moreover, the court in *Beacon Construction Co.* characterized the bidder under such circumstances to be under an "affirmative obligation" to call attention to obvious omissions and ensure that they were deliberate, before taking advantage of the omissions. 161 Ct.Cl. at 7, 314 F.2d at 504. The duty to seek clarification of discrepancies is a preventative measure, designed to avoid confusion, and needless litigation, regarding matters that can be clarified and resolved early in the contracting process. *International Transducer Corp. v. United States,* 30 Fed.Cl. at 527; *George E. Newsom v. United States,* 230 Ct.Cl. at 303, 676 F.2d at 649.

In the case at bar, the solicitation even incorporated 48 C.F.R. § 52.215–14 (1996) into the solicitation by reference, as follows:

EXPLANATION TO PROSPECTIVE OFFERORS (APR 1984)

Any prospective offeror desiring an explanation or interpretation of the solicitation, drawings, specifications, etc., must request it in writing soon enough to allow a reply to reach all prospective offerors before the submission of their offers.

48 C.F.R. § 52.215–14.

The United States Court of Appeals for the Federal Circuit has directed, moreover, that, under the duty to inquire, it is not necessarily enough for a contractor to bring a discrepancy to the attention of the contracting officer. A contractor must call attention to obvious and significant discrepancies, and if the government's response does not alleviate the confusion, the contractor must request further clarification. In *Community Heating & Plumbing Co., Inc. v. Kelso,* the court ruled that:

[I]t is not enough under the duty to inquire that a contractor merely make an initial inquiry. *Beacon Constr. Co. v. United States,* 314 F.2d 501, 504, 161 Ct.Cl. 1 (1963) (holding that duty to inquire requires the contractor to call attention to obvious contract omissions and make certain they were deliberate). Also instructive on this point is *Construction Service Co.,* ASBCA No. 4998, 59–1 BCA (CCH) ¶ 2077 at 8838, 1959 WL 344, where a contractor requested clarification of a contract but received an addendum which did not alleviate the confusion. The board found that the duty to inquire had not been met. 'If after receiving the addendum, the intended meaning was still not clear to appellant, it should have requested a further clarification.' *Id.* at 8846–47.

This holding was reiterated in *Southside Plumbing Co.,* ASBCA No. 8120, 64 BCA (CCH) ¶ 4314 at 20,860, 1964 WL 873. In that case, a contractor became aware of an ambiguity prior to bidding, sought and received an addendum that was expected to furnish clarification and later realized that the addendum failed to resolve the ambiguity. Without seeking further clarification, the contractor bid on the basis of its own interpretation, which, under the circumstances, was more favorable to the contractor. The board held that the contractor had not met its burden under the duty to inquire. 'Here, the appellant not only recognized the ambiguity but made inquiry. This circumstance, in our opinion, brings the case within the principle in *Construction Service Company,* that the inquiry should have been pursued to clarification.' *Id.* at 20,861 (citation omitted).

The Navy's response to the June 4 letter expressly failed to address the issue of the conduit sleeves and thus provided a strong indication to Community that confusion still existed between the parties. Community was therefore obligated to request further clarification regarding the proper installation of the conduit sleeves. While it troubles this court that the Navy did not directly and timely object to Community's contract interpretation, Community nevertheless failed to satisfy its own obligations under the duty to inquire and thus acted at its own risk when it proceeded to perform on the contract.

987 F.2d at 1580.

In determining whether plaintiff in the above-captioned case satisfied its duty to inquire, the court notes that, after receiving the solicitation at issue, but before initial proposals were submitted, ATG submitted a three-page letter to the Navy seeking clarification on a number of issues. In the letter, plaintiff referred to the pages in the solicitation containing Section M, and made this inquiry:

Pages 93 and 94: Cost proposal evaluation states that labor will be evaluated at 100% straight time and that overtime will not be evaluated. Should the total lot price include the amount estimated for overtime or should it only include straight time?

The Navy's response was, "[t]he solicitation is clear on its face." In its proposal, plaintiff included the amount estimated for overtime in its total lot price, in its initial proposal and in its BAFO, but in both cases plaintiff separated straight time and overtime, and included the following footnote:

On page 93 the RFP states, 'Labor will be evaluated *on the basis of 100% straight time. Uncompensated overtime and overtime rates will not be used in the*

*evaluation.'* For the convenience of the evaluators Allied Technology Group has separated straight time costs and over-time costs for CLIN's 0001, 0006, 0011, 0016, 0021. Allied Technology Group has proposed no uncompensated overtime in this proposal.

(Emphasis in original.)

Ten days after ATG's inquiry, another prospective contractor made a similar inquiry to the Navy, which was responded to by the Navy, as follows:

On page 93, the first subparagraph (3), states that labor will be evaluated on a basis of 100 per cent straight time (at 1920 hr/man yr), and uncompensated overtime and overtime rates would not be used in the evaluation. Relative to this,

a. Why is the Government not evaluating uncompensated overtime based upon the requirements set forth in Section B, under subparagraphs (d) and (e) of paragraph IDENTIFICATION OF UNCOMPEN-SATED OVERTIME (starting on page 9), and paragraph IDENTIFICATION OF RATIOS (starting on page 10)?

b. Why is the Government not evaluating overtime rates based upon overtime hours being rolled into the lot year level of effort total estimated manhours of direct labor (on page 5), and definitions provided under paragraph C7 (on page 30)?

Response:

The solicitation is clear on its face.

(Abbreviations and emphasis in original.) Plaintiff's inquiry and the Navy's curt response were published and provided to all offerors by Amendment 0004 to the solicitation; the second inquiry and the Navy's virtually identical response were also published and provided to all offerors, including plaintiff, by Amendment 0006 to the solicitation.

The overtime inquiries made by the plaintiff and the second contractor, as outlined above, provided defendant a reasonable opportunity to clarify and resolve the discrepancies in the solicitation regarding overtime. Both inquiries addressed to the Navy reasonably raised the issue of whether the Navy intended to use overtime rates or straight time rates to evaluate overtime hours, and

clearly drew the Navy's attention to the specific, problematic language. Both times, the Navy deliberately refused to substantively address the questions raised. Had the Navy's non-responsive answers to the overtime inquiries and their publication by issuing amendments to the solicitation not been so definitive, the plaintiff might have remained under a duty to inquire further under *Community Heating & Plumbing.* The Navy's handling of these two clarification requests clearly established, however, that further inquiries by prospective offerors in an attempt to meet the *Community Heating & Plumbing* test to pursue their inquiry "to clarification" would have been to no effect. In the instant case, the plaintiff, and at least one other contractor, made genuine attempts to seek clarification and were completely rebuffed by the agency officials. The court believes that, even under *Community Heating & Plumbing,* there is a point at which a contractor is entitled to defer from further inquiry, knowing that further attempts would be futile.

The court finds the government's pattern of behavior troubling. Based on its presolicitation determination, the Navy, despite the words of section M of the solicitation, appears to have intended to evaluate overtime hours at overtime rates, and, in fact, did so initially. Moreover, there was only one round of BAFOs, so that after plaintiff's agency protest, when the Navy reconsidered the overtime cost evaluation and reevaluated using straight time rates for overtime hours, it used the same BAFOs from the offerors to calculate the numbers and to identify the lowest evaluated cost proposal. The Navy must take responsibility for its actions, namely, that it developed and published the ambiguous solicitation language, that it initially evaluated the offers received using overtime rates in accordance with its own interpretation of the language in the solicitation, and that it refused to respond meaningfully to multiple inquiries on how to calculate overtime in the evaluation process. The court, therefore, finds the Navy's handling of the evaluation process on the issue of overtime was arbitrary and capricious. Utilizing the *Keco II* standards, although the Navy did not evidence bad faith and the amount of

discretion accorded to the agency is broad, the Navy did not act reasonably during the pre-bid phase of the procurement at issue when faced with a solicitation containing ambiguous language, about which prospective offerors inquired. Once ambiguities have been identified, in this case by the plaintiff, and clarification has been genuinely sought, the inconsistencies must be interpreted against the Navy as the drafter.

Although overtime rates may not be used to evaluate overtime hours, defendant argues that straight time rates may be so employed. It is true that there is no explicit prohibition on the use of straight time rates, and that not to evaluate overtime hours in any form is inconsistent with the tenor of the JMCIS solicitation, including the principles of cost realism. Were the warehousing cost issue, discussed below, not dispositive in this case, the court would be inclined to remand this case to the Navy for further disposition consistent with this opinion.

*Warehousing Costs*

■ In the cost evaluation of ATG's BAFO, the Navy included in its calculations the solicitation-provided, estimated direct warehousing costs (plus an associated material handling charge), but did not adjust the evaluation of plaintiff's proposal for the amounts also set forth in plaintiff's BAFO proposal as warehousing costs included in overhead. The solicitation requested that offerors list both direct and indirect costs, if applicable. The plaintiff supplied both in its proposal, and the Navy evaluated both when reviewing ATG's cost proposal. Plaintiff contends that the Navy, thereby, double counted plaintiff's warehousing costs, al-

though the Navy should have excluded the solicitation-provided cost estimates from plaintiff's proposal, since plaintiff had accounted for warehousing costs with allocations from its overhead pool. The defendant and the intervenor argue that because in its proposal plaintiff appeared to contemplate directly charging at least some of its warehousing costs, in addition to allocating the costs from an overhead pool, it was justified to evaluate both direct and indirect costs for plaintiff's proposed warehousing function. The government, however, now offers that a proper computation of plaintiff's warehousing costs might be to include in the cost evaluation the difference between the estimated direct costs for warehousing provided in the solicitation and the amount of warehousing costs included in plaintiff's overhead.

Section B of the solicitation, "SUPPLIES/SERVICES AND PRICES," indicates that the cost of the level of effort hours should be proposed by offerors, but also provided "not to exceed" cost figures for material, travel, and warehousing costs. Section B, therefore, indicates that the award competition should focus on level of effort costs, and not on these named costs. Thus, in Section B of the solicitation, certain figures, including warehousing cost figures, are already entered, with varying amounts for the base year and for each of the four option years, while other categories are left blank for the offerors to propose their own figures. A portion of section B, for illustrative purposes, as it is included in the amendment to the solicitation (similar provisions are included in the solicitation for subsequent option years), reads as follows:

SECTION B–SUPPLIES/SERVICES AND PRICES

| Item | Supplies/Services—LOT I | Qty. | Unit | Unit Price | Amount |
|------|------------------------|------|------|-----------|--------|
| 0001 | Technical support for the Joint Maritime Command Information Systems (JMCIS) Data Processing System in accordance with Section C for the period from 01 Nov 1996 through 12 months thereafter. | 1 | LT | | |
| 0002 | TECHNICAL DATA, IAW DO Form 1423 Exhibit A. | 1 | LT | NSP | NSP |
| 0003 | Estimated * MATERIAL in support of CLIN 0001. | 1 | LT | NTE | $2,000,000.00 |
| 0004 | Estimated *TRAVEL in support of CLIN 0001. | 1 | LT | NTE | $1,500,000.00 |

| Item | Supplies/Services—LOT I | Qty. | Unit | Unit Price | Amount |
|------|--------------------------|------|------|------------|--------|
| 0005 | Estimated * WAREHOUSING in support of CLIN 0001. | 1 | LT | NTE | $ 600,000.00 |

Total Estimated Cost
Fixed Fee

Total Estimated CPFF  _____

* MATERIAL, TRAVEL, AND WAREHOUSING SHALL BE BILLED AT ACTUAL COST PLUS GENERAL AND ADMINISTRATIVE COST, IF ANY. FEE SHALL NOT BE APPLIED TO THESE CONTRACT LINE ITEMS.

Furthermore, Section L of the solicitation, titled "INSTRUCTIONS, CONDITIONS & NOTICES TO OFFERORS," lists the same Navy provided figures as in Section B, for "TRAVEL, WAREHOUSING and MATERIAL," costs for the base and option years, and advises that these amounts "shall be used" to evaluate cost proposals, as follows:

(g) The following amounts (plus applicable G & A Material Handling) shall be utilized for evaluation purposes only in determining total cost for entire contract.

|  | TRAVEL | WAREHOUSING | MATERIAL |
|--|--------|-------------|----------|
| Base Year | $1,500,000.00 | $600,000.00 | $2,000,000.00 |
| Option I | $1,550,000.00 | $625,000.00 | $2,150,000.00 |
| Option II | $1,600,000.00 | $650,000.00 | $2,300.000.00 |
| Option III | $1,650,000.00 | $675,000.00 | $2,450,000.00 |
| Option IV | $1,700,000.00 | $700,000.00 | $2,600,000.00 |

\* \* \*

(iii) Any offeror having an accounting system which includes, within overhead or G & A, the cost elements set forth above shall *specifically* state this fact within the cost proposal. This will preclude these costs from being unduly considered in the Government's cost evaluation.

(Emphasis in original.)

Finally, section M, titled "EVALUATION FACTORS FOR AWARDS," includes a matrix (identical to the one found in Section L), and numbers, which are the same as in Section B, but uses different introductory words and different explanatory language after the numbers, as follows:

The Government has estimated travel and material costs as specified below:

|  | TRAVEL | WAREHOUSING | MATERIAL |
|--|--------|-------------|----------|
| Base Year | $1,500,000.00 | $600,000.00 | $2,000,000.00 |
| Option I | $1,550,000.00 | $625,000.00 | $2,150,000.00 |
| Option II | $1,600,000.00 | $650,000.00 | $2,300.000.00 |
| Option III | $1,650,000.00 | $675,000.00 | $2,450,000.00 |
| Option IV | $1,700,000.00 | $700,000.00 | $2,600,000.00 |

The Government's estimated travel and material costs (plus applicable burden) shall be used for the purpose of evaluating the cost/price proposal. Therefore, offerors must use these estimates in preparing their cost/price proposals. Application of material handling charges and/or G & A rates, as appropriate, will be allowed only if the contractor maintains separate accounts for such costs.

As is evident from the language of the solicitation, the introductory language to the columns in Section L indicated that travel, material, and warehousing costs listed "shall be utilized" for evaluating proposals. In Section M, although the section includes the three columns of cost numbers, for "TRAVEL, WAREHOUSING and MATERIAL," the words introducing and explaining Section

M list only travel and material costs, but not "warehousing" costs.

The plaintiff utilized the Navy-provided, direct cost figures, including those for warehousing, in both its initial proposal and in its BAFO. In its proposal, the plaintiff *also advised the Navy that it had included facility/warehousing costs in its overhead pool, that it had provided overhead cost data for warehousing costs, and indicated that these included rent, insurance, telephone service, repairs, maintenance, utilities, taxes and the forklift specified in the Statement of Work. The warehousing costs issue was not raised by the plaintiff prior to submission of its proposal, nor was it raised by the plaintiff or the defendant during the discussions held after the proposals were submitted, but prior to award of the contract.

ATG argues that the language of Section M in the evaluation criteria is controlling. Plaintiff, therefore, argues that because the verbiage in Section M did not specifically list warehousing, only the direct costs provided for travel and material costs were mandatory for use in the cost evaluation. Plaintiff makes this assertion despite the inclusion in Section M of the column for government warehousing costs and the language of Section L which includes government-estimated warehousing costs as mandatory for evaluation purposes. Plaintiff argues that the Navy-provided $3,250,000.00 (the total of the warehousing costs in the columns for the base year and four option years) warehousing cost figure, should be deleted from evaluation of its proposal, and that its material handling rate should be adjusted after the deletion. Plaintiff argues that because, according to its reading of the solicitation, the Section M evaluation criteria permitted it to substitute its lower overhead warehousing costs figures for the Navy's direct warehousing charges,[6] plaintiff was that much closer to having the lowest evaluated cost proposal. In response, the defendant and the intervenor suggest that, consistent with the solicitation, the way to compensate for any possible prejudice which might have occurred to the

plaintiff in the evaluation of ATG's warehousing proposal as a result of possible double counting, is to adjust the figure to ensure that all offerors effectively are charged the same costs for warehousing. To ensure equality in the evaluation of warehousing costs, defendant proposes an evaluation adjustment which includes the difference between the Navy's estimated direct warehousing costs (plus material handling fee) and plaintiff's overhead amounts for warehousing, plus any applicable indirect costs.

Contracts and solicitations are to be read as a whole, so as to give meaning to all provisions:

'[T]he contract should be interpreted in a manner which gives meaning to all its parts and in such a fashion that the provision [sic] do not conflict with each other, if this is reasonably possible.' *B.D. Click Co. v. United States,* 222 Ct.Cl. 290, 299, 614 F.2d 748, 753 (1980) (citing cases). The same maxim applies to interpretation of a solicitation. *See Blake Constr. Co. v. United States,* 202 Ct.Cl. 794, 798, 1973 WL 21355 (1973).

*Vanguard Sec., Inc. v. United States,* 20 Cl.Ct. 90, 103 (1990). *In accord, United Int'l Investigative Services v. United States,* 109 F.3d at 737; *Lockheed Martin IR Imaging Sys., Inc. v. West,* 108 F.3d at 322. Another formulation of the rule appears in *Hol–Gar Manufacturing Corp. v. United States,* as follows:

[T]he intention of the parties must be gathered from the whole instrument. Also, an interpretation which gives a reasonable meaning to all parts of an instrument will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless or superfluous; nor should any provision be construed as being in conflict with another unless no other reasonable interpretation is possible (citations omitted).

*Hol–Gar Mfg. Co. v. United States,* 169 Ct. Cl. at 395, 351 F.2d 972.

The goal, therefore, should be to read Section L and Section M of the solicitation,

---

**6.** In fact, plaintiff was the only JMCIS offeror which accounted for warehousing costs through overhead. Therefore, each of the other offerors, including the intervenor, were evaluated using the government-provided cost figures for warehousing.

which contain the identical cost information, together, along with Section B, to result in a uniform evaluation of warehousing, travel and material costs. Section B provided filled-in cost figures for warehousing costs; Section L repeated the same cost figures, which all offerors were required to use in their proposals for warehousing costs, and directed any offerors to inform the Navy if warehousing costs were included in overhead in its particular accounting system; and Section M repeated the same cost figures for warehousing set forth in Sections B and L, but omitted in the introductory and conclusory language, the word "warehousing." A reasonable interpretation of all three sections, taken together, is that offerors were instructed to use the Navy-provided costs for warehousing, and that offerors, such as the plaintiff, which accounted for warehousing costs through overhead pools, were instructed to so state, in order to insure that warehousing costs would not be counted twice by the Navy during the evaluation of proposals. The goal, as stated in the solicitation, was to keep "these costs from being unduly considered in the government's cost evaluation."

Turning briefly to the Order of Precedence clause included in the solicitation, Section B of the solicitation was in the "Schedule," and both Sections L and M were in the "representations and other instructions." The Order of Precedence clause, 48 C.F.R. § 52.215–33 (1996), was included in this solicitation at Section I, "CLAUSES AND PROVISIONS," and provided that:

> [a]ny inconsistency in this solicitation or contract shall be resolved by giving precedence in the following order: (a) the Schedule (excluding the specifications); (b) representations and other instructions; (c) contract clauses; (d) other documents, exhibits, and attachments; and (e) the specifications.

Thus, as to the inconsistencies, Sections B took precedence, and Section L had equal precedence under this clause with Section M. *See Vanguard Sec., Inc. v. United States*, 20 Cl.Ct. at 104. The solicitation's Order of Precedence clause provides further support for a harmonious reading of the whole solicitation in which the government's direct warehousing costs included in Sections B, L, and M are to be utilized in the evaluation of the proposals received.

Furthermore, the way to insure that warehousing costs are not counted twice is to include in the cost evaluation: "the difference between the Navy's estimated direct warehouse costs ... [plus material handling fee] and an amount equal to the amounts included by plaintiff for warehousing in its overhead, ... plus the applicable indirect cost." With this formula, Sections B, L, and M can be read together and can be given a reasonable meaning. In this way, plaintiff is not penalized by double counting warehousing costs in its overhead pool and as a direct warehousing cost; while at the same time plaintiff is not permitted to propose lower overhead costs, when other offerors are required to use Navy-provided direct costs for warehousing, regardless of their own individual cost estimates for warehousing.

An interpretation of the solicitation at issue which results in the exclusion of the Navy's estimated direct warehousing costs, exclusively for offerors such as the plaintiff, which indirectly charge warehousing costs in overhead, would be prejudicial to each of the other offerors who were required to use, and, who did use, the Navy-provided costs. The plaintiff argues that any offeror could have proposed its own warehousing costs. However, only offerors which accounted for warehousing costs through overhead were instructed additionally to provide those costs. Other offerors, like the intervenor, were required to use only the standard, solicitation-provided costs. Plaintiff's proposed evaluation scheme, wherein some offerors are required to use a Navy-estimated direct warehousing cost, while others are free to use their own overhead costs for warehousing, serves to unduly and arbitrarily penalize the former on the basis of individual cost accounting practices.

Furthermore, if it is not possible to achieve a harmonious reading, such a resulting conflict is exactly the sort of "incipient problem" or inconsistency discussed above (in the portion of this opinion addressing the evaluation of overtime), which places a duty on the plaintiff to inquire and seek clarification of

Sections B, L, and M in the solicitation, prior to submitting a proposal. Having failed to raise the issue prior to submitting its proposal, as discussed above, ATG may not now raise the warehousing issue in an attempt to defeat a harmonious reading of the entire solicitation and render the Section L language on warehousing costs "useless, inexplicable, inoperative, void, insignificant, meaningless or superfluous." *Hol–Gar Mfg. Co. v. United States,* 169 Ct.Cl. at 395, 351 F.2d 972. This is particularly true since based on the record before the court there is no indication that ATG raised any concerns about how to propose its warehousing costs or how the government would evaluate such costs, even though ATG specifically inquired about how to propose overtime costs and how those costs would be evaluated.

■ In *Aerolease Long Beach v. United States,* a case decided in the United States Court of Federal Claims, the court considered the timeliness of a protest, as follows:

The defendant initially seeks to rebuff the challenges to the contracting officer's methodology of price evaluation based strictly on the untimeliness of the challenges to the term of the SFO [solicitation for offers]. As the evaluation criteria contain no reference to the costs proffered by the protesting parties for consideration (at least for cancellation costs and overtime charges), the defendant contends that the plaintiff and the intervenor maintain challenges to the terms of the SFO as improper. If so, the defendant explains, the parties' objections come before the Court on an untimely basis: 'To be timely, any objection to the terms of the [solicitation] itself should have been raised prior to the closing date for receipt of proposals.' *Saxon Export,* B–253441, 93–2 CPD ¶ 130, at 4. In short, the defendant asks this Court to apply the requirements of the GAO bid protest regulations. *See* 4 C.F.R. § 21.2(a)(1) (1992) ('Protests based upon alleged improprieties in a solicitation which are apparent prior to bid opening or the time set for receipt of initial proposals shall be filed prior to bid opening or the time set for receipt of initial proposals.') While this Court declines to accept this

regulation as controlling in all cases, the defendant persuasively demonstrates the utility of the GAO rule in the bid protest arena. See *Logicon, Inc. v. United States,* 22 Cl.Ct. 776, 789 (1991) (finding favor with the timeliness regulations of the GAO for bid protests). If an offeror recognizes an ambiguity or other problem in the solicitation, proper procedure dictates that the offeror challenge the problem before submission of an offer. If the offeror declines to challenge the problem, the reviewing tribunal may find that the offeror waived its right to protest. Here, although the plaintiff submitted a letter with its initial offer requesting evaluation of cancellation costs, the plaintiff nevertheless submitted an offer without using the available avenues of redress for objection to the provisions of the SFO. Further, the intervenor only challenged the preclusion of cancellation costs, service costs, and overtime charges from the evaluation criteria after the submission of revised BAFO's. In circumstances such as these, this Court finds application of the GAO rule fitting, based not on adoption of the regulation but on the wide discretion afforded the contracting officer to conduct negotiations pursuant to the terms of the SFO.

31 Fed.Cl. 342, 358 (1994). Objections to the face of a solicitation should be raised prior to submission of proposals. There is a duty to inquire and seek clarification of obvious omissions, inconsistencies, or discrepancies of significance, otherwise waiver occurs. *Beacon Constr. Co. v. United States,* 161 Ct.Cl. at 7, 314 F.2d at 504. Plaintiff should not be allowed to raise such issues after contract award.

The words of the solicitation contemplated that the government-provided warehousing costs would be used in the evaluation of proposals. In measuring prejudice to the plaintiff stemming from the evaluation, the Navy's interpretation of the collective provisions on warehousing, combined with the adjustment for plaintiff's warehousing overhead costs proposed by the defendant and contemplated by the solicitation in order to avoid double counting, is reasonable, and would avoid prejudicial treatment among offerors. Plaintiff, however, only can prevail if the

government utilizes ATG's indirect warehousing costs and does not use the government-provided warehousing costs when evaluating plaintiff's proposal. Moreover, based on ATG's failure to raise the warehousing issue in a timely fashion, the court cannot offer any relief to the plaintiff on the issue of warehousing costs.

## CONCLUSION

In order to prevail in the above-captioned case, plaintiff must succeed on both the overtime and the warehousing cost issues. Plaintiff has stipulated that failure to prevail on either issue is fatal to its post-award bid protest. Plaintiff has failed to prevail on the warehousing cost issue. Thus, in the final computation of offers received on the contract at issue, the plaintiff cannot demonstrate prejudice from the award of the contract to the intervenor. CSI has submitted the lowest cost proposal under both the Navy's original analysis, and under this court's subsequent analysis. The record in the above-captioned case supports the defendant's and the intervenor's motion for summary judgment.

Therefore, the court **DENIES** the plaintiff's motion for summary judgment and **GRANTS** the defendant's and the intervenor's cross-motions for summary judgment. The Clerk's Office is directed to enter judgment in favor of the defendant and the intervenor in accordance with this decision.

**IT IS SO ORDERED.**